IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMARI COMPANY, INC., ALL ABOUT CONSTRUCTION, INC., AMAZING PRODUCTIONS, INC., BBQ ISLAND, LLC, BRADLEY M. GRIFFIN, CAPITAL REMOVAL, CAPTAINS SELECT SEAFOOD, ENTRAL RADIATOR CABINET COMPANY, INC., COMPSOLUTION VA, INC., COOL ACCESS, LLC, DAMES AIR, LLC, DEPATCO, INC., EVCO COMMERCIAL CONSTRUCTION, CORP., GLENN TERRY TRANSPORT, INC., GIGS, INC., GILBERT-AMERICAN COMPANIES, GRANITE TRANSFORMATIONS, GREATER DALLAS WHOLESALE & SUPPLY CO., INC., GREGORY & MARTIN, INC., GUNNISON METAL SHOP, INC., HANDLEY HEAT & AIR, HINSDALE SALES & RENTALS, INC., HITECH FIRE DETECTION, INC., HRJL ARCHITECTS, INC., INDUSTRIAL RESOURCE GROUP, LLC, INTEGRATED SIGN AND GRAPHIC, INC., JOHN CARDULLO & SONS, INC., JOSEPH E. CLOUSE, INC., JRP CONSTRUCTION, LLC, J.V. HANSEL CO., INC., KYLES DISCOUNT STUFF, MILLS MFG., INC., MSI READY MIX, INC., PHILIPSBURG ELECTRIC & SUPPLY, INC., PRECISION PAINTING AND DECORATING, INC., PROGRESSIVE CORPORATE SHELLS OF COLORADO SPRINGS, INC., ROBERT S. CHAMBERLAIN d/b/a/ A1 FACTORY DIRECT CARPET, A1 RESTORATION, A1 VALLEY CENTER CARPET AND CLEANING, TRING CORP., TRINKS BROTHERS, LLC, VALLEY MANAGEMENT, INC.,<br><br>    Plaintiffs, | No. 07 C 1425 |

|  |  |
|---|---|
| v. | ) |
|  | ) |
| **JOHN R. BURGESS, GREGG M.** | ) |
| **STEINBURG, TYLER BURGESS, DEAN** | ) |
| **KALOMIRIS, JOHN OWEN, KATRIN** | ) |
| **OWEN, NANCY HOWARD, KENNETH** | ) |
| **SWEET, JOHN DOES, JOHN ROES,** | ) |
| **JANE DOES, JANE ROES,** | ) |
|  | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Amari Company, Inc.; All About Construction, Inc.; Amazing Productions, Inc.; BBQ Island, LLC; Bradley M. Griffin, d/b/a Home Theater Design Group; Captial Removal; Captains Select Seafood; Central Radiator Cabinet Company, Inc.; Compsolution VA, Inc.; Cool Access, LLC; Dames Air, LLC; DePatco, Inc.; Evco Commercial Construction Corp.; Glenn Terry Transport, Inc.; Gigs, Inc.; Gilbert-American Companies; Granite Transformations; Greater Dallas Wholesale and Supply Co., Inc.; Gregory and Martin, Inc.; Gunnison Metal Shop, Inc., Handley Heat and Air; Hinsdale Sales and Rentals, Inc., d/b/a Robust/Valley Sales and Rentals, Inc.; HiTech Fire Detection, Inc.; HRJL Architechs, Inc.; Industrial Resource Group, LLC; Integrated Sign and Graphic, Inc.; John Cardullo and Sons, Inc.; Joseph E. Clouse, Inc.; JRP Construction, LLC; J.V. Hansel Co., Inc.; Kyles Discount Stuff; Mills Mfg., Inc.; MSI Ready Mix, Inc.; Philipsburg Electric and Supply, Inc.; Precision Painting and Decorating, Inc.; Progressive Corporate Shells of Colorado Springs, Inc. d/b/a Black Forest Service Center; Robert S. Chamberlain d/b/a A1 Factory Direct Carpet, A1 Restoration, A1

Valley Center Carpet and Cleaning; Tring Corporation; Trinks Brothers, LLC; and Valley Management, Inc. (collectively "plaintiffs") have filed an amended complaint ("the complaint") against defendants John R. Burgess, Gregg M. Steinburg, Tyler Burgess, Dean Kalomiris, John Owen, Katrin Owen, Nancy Howard, Kenneth Sweet, John Does, John Roes, Jane Does, Jane Roes (collectively "defendants"). Defendants have moved to dismiss the complaint, with prejudice, under Fed. R. Civ. P. 12(b)(6). For the following reasons, the motion is denied.

I.

Plaintiffs are various businesses located throughout the United States. As alleged in the complaint, plaintiffs seek relief against defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) & (d). Plaintiffs allege that defendants used numerous corporate shells, including International Profit Associates, Inc. ("IPA"), International Tax Advisors, Inc. ("ITA"), and Accountancy Associates LLC ("AAL"), in perpetrating schemes to defraud. According to the complaint, defendants repeatedly used four specific sub-schemes to defraud plaintiffs. The complaint identifies these as (1) the Business Analysis scheme; (2) the IPA Consulting Agreement scheme; (3) the ITA Consulting Agreement scheme; and (4) the AAL Consulting Agreement scheme. Plaintiffs allege that through these schemes, defendants managed to gain access to plaintiffs' confidential

financial information and to "defraud [] [p]laintiffs and others of their assets and to divert unlawfully those assets to the benefit of [d]efendants and others who had no lawful right to those assets." (Compl. at ¶ 63.) The complaint also alleges defendants perpetrated these schemes largely through acts of mail and wire fraud and also engaged in interstate travel and transportation of stolen property. The identified individual defendants are the Managing Director, President, Director of Client Services, Director of Business Coordination, Director of Sales, Executive Director of Survey Services, Senior Sales Trainer, and Executive Director of Consulting Services of IPA. Each of the identified individual defendants are alleged to have "directed and controlled the other [d]efendants in the implementation of said schemes, for profit." (Id. at ¶¶ 41-48.) Plaintiffs allege defendants acted with "specific intent to defraud plaintiffs." (Id. at ¶ 266.)

The general scheme purportedly aimed to obtain money from plaintiffs "by false pretenses, representations or promises." (Id.) This general scheme was accomplished through the four specifically identified schemes. The Business Analysis scheme is the common subset of all the remaining schemes. Under this scheme, defendants directed their "Business Coordinators" to contact plaintiffs and make a series of alleged misrepresentations, including the nature of their intentions (defendants claimed to offer consulting services, but plaintiffs allege they simply sought

4

to defraud plaintiffs) and qualifications, in convincing plaintiffs to make an appointment with defendants' "Outside Sales Representatives" ("OSRs"). The OSRs, at the direction of defendants, then called and traveled to meet with a plaintiff and attempted to sell a "business analysis" for a fee. The OSRs represented a "business analysis" as a service which provided an "objective in-depth analysis" of the plaintiff's business "exposing any and all weaknesses[] and pinpointing potential and/or existing problem areas." (Id. at ¶ 75.) Under a business analysis service defendants purported to examine each plaintiff's "company's volume and profit, and perform a preliminary tax analysis." (Id. at ¶ 79.) Plaintiffs were also told they would receive a "prioritized plan for addressing weaknesses and problems exposed by the analysis." (Id. at ¶ 75.) When plaintiffs agreed to obtain this service the OSR then negotiated the price, which ranged among plaintiffs from approximately $400 to $1,200, and prepared the contract which plaintiffs allege defendants never intended to fulfill.

Once plaintiffs entered into the business analysis agreement, defendants sent a "Business Analyst" to obtain and reproduce plaintiffs' confidential information, including tax returns and other financial statements, and transmitted these through facsimile to defendants. While plaintiffs believed the information was being transmitted to be subjected to additional review and analysis, the

5

complaint alleges that defendants used the information to determine how much money could be obtained from plaintiffs through the scheme. (Id. at ¶ 90.) The Business Analysts then misrepresented the state of plaintiffs' financial condition to plaintiffs, feigning an immediate crisis and advised that plaintiffs had to buy defendants' additional consulting services to avoid the crisis. (Id. at ¶ 91.) Plaintiffs allege defendants trained the Business Analysts to engage in "false, misleading and deceptive acts to falsely entice, condition, coerce and scare [plaintiffs] into a sense of immediate crisis." (Id. at ¶ 27.) In reliance of these statements, plaintiffs agreed to enter into contracts with one or more of the defendants' corporate shells for additional consulting services. (Id. at ¶ 96.)

As described in the complaint, the additional consulting services consisted of the IPA Consulting Agreement scheme, ITA Consulting Agreement scheme, and AAL Consulting Agreement schemes. These schemes are alleged to be "essentially identical," (id. at ¶ 61), differing only in that they involved different corporate shells used by defendants and titles of the services they purport to provide. The agreements after which plaintiffs title these schemes describe the specific consulting services offered by defendants to plaintiffs, once the business analysis was concluded, to solve the "crisis" identified by the business analysis. These included "independent valuation[s] of [plaintiff's] business and

prepar[ation of] an unbiased . . . [r]eport"; an "exit strategy plan" and report "regarding the reasonableness of the pro forma financial and operational projections incorporated in the [exit strategy plan]"; and "tax services." (Id. at Ex. J.) Plaintiffs allege defendants do not intend to provide such services, instead duplicating the work from business analysis and reproducing boiler plate reports.

According to the complaint, defendants sent "business consultants" who were unqualified, acting in bad faith, and duplicating the business analysis meanwhile improperly billing plaintiffs by the hour until the number of hours listed in the agreement were exhausted (the specific number of hours to be worked is included in the agreement). Plaintiffs further allege that defendants denied plaintiffs the ability to cancel the IPA Consulting Agreement in accordance with its terms. The Agreement provided that

> Client may terminate the services of IPA, or recess the project, at the end of any business day by declaration of such intent to the Project Manager, at the same time presenting to the Project Manager or Senior Business Consultant a check for all fees and written statement expressing Client's opinion of the services rendered. This statement must be originated solely by Client.

(Id. at Ex. J, K, P.) According to plaintiffs, defendants directed the Project Manager to leave the job site after the morning of the second day of services and leave a second consultant behind to continue billing time under the Agreement. (Id. at ¶ 119.) In the

absence of the Project Manager or a Senior Business Consultant, plaintiffs were unable to terminate the Agreement in accordance with its terms. Plaintiffs also allege that in the event that a plaintiff attempted to terminate the Agreement, defendants' policy was to deny knowledge of a cancellation in order to continue billing. (Id. at ¶ 121.)

II.

In assessing defendants' motion to dismiss under FED. R. CIV. P. 12(b)(6), I must accept all well-pleaded facts in the complaint as true. *McMillan v. Collection Prof'ls*, 455 F.3d 754, 758 (7th Cir. 2006). I must view the allegations in the light most favorable to plaintiffs. *Id*. However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. - -, 127 S. Ct. 1955, 1965 (May 21, 2007); *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007); *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007).

III.

Defendants argue the complaint fails to state a claim under § 1962(c) & (d). In order to state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Jennings*, 495 F.3d at 472 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985)). To state a claim for conspiracy under § 1962(d),

8

a plaintiff must allege: "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999) (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998)). "A pattern of racketeering activity consists, at the very least, of two predicate acts of racketeering committed within a ten-year period." *Jennings*, 495 F.3d at 472 (citing § 1962(c), *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992)). A plaintiff must also satisfy "the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Id*. (quoting *Midwest Grinding*, 976 F.2d at 1019).

Defendants argue the complaint identifies only legitimate conduct, such as "sales puffery" — not mail or wire fraud — and fails to plead with particularity. The elements of wire fraud and mail fraud are "(1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme." *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006) (citations omitted). "Intent to defraud requires a wilful act by

the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002). Violations of the federal mail and wire fraud statutes qualify as acts of racketeering upon which a federal RICO claim can be predicated. *See* § 1961(1)(B) (citing 18 U.S.C. §§ 1341, 1343). Interstate travel as part of a scheme to defraud also qualifies as predicate acts. *Id.* (citing 18 U.S.C. § 2314). Allegations of mail and wire fraud are further subject to FED. R. CIV. P. 9(b)'s heightened pleading standard. *See, e.g.*, *Jepson, Inc., v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994). To satisfy Rule 9(b), "plaintiff must, within reason, describe the time, place, and content of the mail [or wire] communications" and identify the parties to th[o]se communications." *Id.* at 1328.

The complaint sufficiently alleges mail and wire fraud, and interstate travel, as a part of defendant's schemes and as the predicate acts of racketeering. The complaint alleges that defendants (1) had a scheme, (2) intended to defraud plaintiffs, and (3) used the telephone and sent materials through facsimile and the mails in furtherance of the scheme, and traveled interstate in furtherance of the scheme. These acts are alleged to have been numerous and continuous, both collectively and with respect to each

plaintiff, and spanning over a period of years.[1] All plaintiffs allege defendants induced them to pay them money as a result of this fraud. Contrary to defendants' argument, the exhibits do not refute the fraud claims. The exhibits include copies of the agreements, defendants' training manuals, printed advertisements, and invoices — all of which plaintiffs allege were part of or assisted in the scheme. Plaintiffs specifically allege that they entered into these agreements as a result of the misrepresentations by defendants and that defendants did not intend to live up to those representations.[2] When taken in the best light to plaintiffs, these do not contradict plaintiffs' allegations or fatally undermine their claims. None of the exhibits defeat plaintiffs' allegations concerning the predicate acts in question.

Defendants also argue their business model is not fraudulent, contrary to plaintiffs' allegations. In support, they rely on a business school textbook. This textbook is irrelevant under the standard governing motions under FED. R. CIV. P. 12(b)(6). First, this book is plainly outside of the pleadings and, second, any issue concerning the merits of the allegations cannot be taken up at this juncture. Therefore, this argument fails.

---

[1] Defendants have not made any arguments concerning the number or continuity of the predicate acts.

[2] Defendants point out that the language of the agreements do not misrepresent the qualifications or job titles of the OSRs, business analysts, and others. Nonetheless, plaintiffs' remaining allegations sufficiently plead the predicate acts of mail and wire fraud.

11

The complaint also complies with Rule 9(b), particularly in light of Exhibit 1.  First, it sufficiently identifies the specific dates - the "when" - on which defendants (a) initiated contact with plaintiffs through the business coordinators, OSRs and business analysts, and in turn when alleged misrepresentations were made by those parties; (b) the specific dates on which the business analysis was performed; and (c) the dates on which parties entered into additional agreements.  Second, the complaint also identifies the persons involved by providing the names of specific OSRs and Business Analysts that met with each specific plaintiff.  All of these individuals are specifically alleged to be under the control of the remaining defendants and acting in furtherance of the scheme.  Third, plaintiffs identify the specific method by which alleged misrepresentations were made, *i.e.*, in person, by mail, by telephone.  The complaint also specifies the amounts plaintiffs paid defendants for the business analysis and subsequent services.  Finally, the complaint provides that all plaintiffs entered into the business analysis agreement, and therefore were subject to the misrepresentations associated with that particular sub-scheme.  Exhibit 1 to the complaint also identifies the specific "additional consulting services" purchased by defendants in terms of the IPA Consulting Agreement scheme, the ITA Consulting Agreement scheme, and the AAL Consulting Agreement.  Accordingly, I find plaintiffs have pled with enough particularity for purposes of Rule 9(b).

IV.

For the foregoing reasons, defendants' motion to dismiss is denied.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**

United States District Judge


Dated: December 4, 2007