

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AMARI COMPANY, INC., <br> a Massachusetts corporation, *et al.*, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | Case No. 07 C 1425 |
| v. | ) <br> ) | Judge Elaine E. Bucklo |
| JOHN R. BURGESS, *et al.*, | ) <br> ) <br> ) | Magistrate Judge <br> Martin C. Ashman |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Amari Company, Inc., *et al.*, have sued Defendants, John Burgess, *et al.*,

alleging violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO").

Currently before the Court is "Plaintiffs' Amended Motion for a Protective Order Related to

Intimidation." Plaintiffs allege that Defendants John Burgess, *et al.*, through their attorney,

Myron Cherry, and their business, International Profit Associates ("IPA"), have improperly

threatened or intimidated witnesses in an attempt to deprive Plaintiffs of information that is

relevant to this case. The motion was referred to this Court by Judge Bucklo pursuant to Local

Rule 72.1. For the reasons stated below, Plaintiffs' motion is denied.

## I. Background

The facts of this case are discussed at length in Judge Bucklo's Memorandum Opinion

and Order of December 4, 2007, denying Defendants' motion to dismiss. *See Amari Co., Inc. v.

Burgess*, No. 07 C 1425, 2007 WL 4292885, at *1-3 (N.D. Ill. December 4, 2007). The Court

will provide only a brief synopsis here. Plaintiffs are a group of approximately forty businesses from around the country who allege that they were swindled by individuals employed by or associated with International Profit Associates, Inc., ("IPA") an Illinois corporation. (Amended Compl., ¶ 279-293.) In their complaint, Plaintiffs allege that John Burgess and several co-defendants engaged in a pattern of fraudulent activity under the auspices of IPA that violated the Racketeer Influenced and Corrupt Organizations Act. (Amended Compl., ¶ 279-293.) The alleged fraud at the heart of this scheme involved the sale of increasingly expensive business consulting services to small and medium-sized companies with the goal of extracting as much money as possible from the client rather than providing helpful business advice. (Amended Compl., ¶¶ 62-141.)

The gravamen of Plaintiffs' current motion is the allegation that "since [this lawsuit was filed] the Defendants, their Enterprises, and their counsel have pursued a course of conduct, the intent of which could only be to harass and intimidate the Plaintiffs, their Counsel and even the Defendants [sic] own ex-employees into giving up their claims in the RICO case." (Pls.' Br. at 2.) According to Plaintiffs, a protective order is necessary in order to prevent the alleged harassment/intimidation from causing "the loss of witnesses and other evidence to support the Complaint." (*Id.*) The harassment that Plaintiffs allege takes several forms.

## A.     Threats of Legal Action

Plaintiffs allege that Defendants have improperly threatened to sue former IPA employees to prevent them from disclosing information about IPA's business methods. Plaintiffs would like to have this information in order to support their theory that Burgess and the other Defendants

used IPA as a vehicle for racketeering activity. One former employee, Valerie Ramsdell,

received a letter on May 1, 2007, accusing her of violating her separation agreement with IPA

and threatening "immediate and decisive action" to enforce IPA's legal rights. (Pls.' Br., Ex. 8.)

Plaintiffs believe that other former employees have also been threatened with legal action based

on confidentiality agreements and assert that the purpose of these threats is not to protect

legitimate business information, but rather to prevent the ex-employees from disclosing the

details of Defendants' racketeering scheme. Plaintiffs urge the Court to consider their allegations

of harassment in light of a 2003 opinion by Judge Gottschall, in which she ruled that IPA could

not use, or threaten to use, an employee confidentiality agreement in order to prevent a former

employee from cooperating with an EEOC investigation of sexual harassment at IPA. *See*

*E.E.O.C. v. Int'l Profit Assocs.*, No. 01 C 4427, 2003 U.S. Dist. LEXIS 6761 (N.D. Ill. April 21,

2003). In Plaintiffs' view, the current threats are merely a continuation of a long-standing policy

of harassment and intimidation based on IPA's employee confidentiality agreements.


### B.     Other Intimidation of Ex-employees

In addition to threats of litigation, Plaintiffs allege that Defendants have engaged in other

intimidation or harassment of ex-employees. As evidence of this harassment, Plaintiffs have

submitted a declaration from Norman Gordon Frandsen, a former IPA employee who earlier

provided a declaration corroborating some of the allegations in Plaintiffs' complaint.[1] Frandsen

---

[1] Plaintiffs filed a raft of affidavits and declarations in connection with their response to Defendants' Rule 12(b)(6) motion to dismiss. These were completely superfluous, as Rule 12(b)(6) requires the Court to consider the legal sufficiency of complaint, not whether there is extrinsic evidence to support the allegations in the complaint.

- 3 -

claims that, as a result of his support for Plaintiffs, he received a phone call from John Burgess in October 2007 in which Burgess threatened to sue him, accused him of lying in his testimony, and called him a "loser" who "need[s] to grow up" and "should be wearing diapers." (Pls.' Br., Ex. 4.) As further evidence of intimidation, Plaintiffs submit the declaration of Toby Marie Walker, another former IPA employee. Walker states that Defendant Tyler Burgess told her in 2004 that she would "be made miserable" and that "all of [her] skeletons and dirty little secrets" would be exposed if she cooperated with the EEOC in its case against IPA. (*Id.*, Ex. 6.) Although she does not claim to have been threatened in connection with the current lawsuit, Walker states that she has "been living in fear of [Tyler Burgess's] reprisals" and is reluctant to speak to Plaintiffs' counsel. (*Id.*)

Also cited in Plaintiffs' motion are the declarations of Justin Hammang and Valerie Ramsdell. (Pls.' Br., Ex. 7, 8.) As former IPA employees, Hammang and Ramsdell claim that John Burgess "repeatedly threatened me and my other co-workers" with statements such as "I'll destroy you," "I'll bury you," and "I'll ruin you" during the years that they worked for him. (*Id.*, Ex. 7, 8.) Continuing their substantially identical sworn statements, Hammang and Ramsdell say that it was "common knowledge" that Burgess would "do or say anything, and use all of his money, political, legal and other connections" against anyone who crossed him. (*Id.*, Ex. 7, 8.) Ramsdell also claims that Burgess has some vital tax documents that belong to her and is "holding [them] over [her] head," although she points to no specific act by Burgess that suggests any sort of quid-pro-quo relating to her potential testimony in this case. (*Id.*, Ex. 8.) Both Hammang and Ramsdell claim that their cooperation with Plaintiffs in this lawsuit has been chilled by their fear of reprisal. (*Id.*, Ex. 7, 8.)

## C. Intimidation of Plaintiffs' Counsel

Plaintiffs' attorney, Robert Reda, claims that Defendants have attempted to intimidate him in order to interfere with his representation of Plaintiffs. The story begins in 2006, when Reda represented one of the Plaintiffs, Central Radiator Cabinet Company ("Central"), in a state court case. In that case, IPA was suing Central in an attempt to collect consulting fees. Reda claims that Defendants attempted to intimidate him in that case by filing a spurious complaint with the Illinois Attorney Registration and Disciplinary Commission ("ARDC"). The complaint, filed by IPA's Assistant Managing Director, alleged that Reda was soliciting clients through comments about IPA that he posted on the Internet. (Pls.' Br., Ex. 9.) Reda denied that he was soliciting clients, although he acknowledged in a letter to the ARDC that "my posting could be easily misinterpreted as 'advertising' or 'solicitation.'" (*Id.*) Reda believes that IPA's intent was to use the ARDC complaint as leverage in the state court case. Reda also alleges that IPA "fabricated" a second complaint based on a pseudonymous Internet comment that urged readers to contact Reda regarding their experiences with IPA. (*Id.*) Reda denied any connection to the comment, and the ARDC ultimately took no action against him. (*Id.*)

After the ARDC incident, Reda says, the intimidation became "a little more subtle . . . relying on insinuation, body language and a 'read between the lines mentality' . . . ." (Pls.' Br. at 9-10.) As evidence of this "subtle" intimidation, Reda points to a phone call and letter he received from Myron Cherry, an attorney for IPA and counsel for Defendants in this case. In the telephone call, Cherry asked Reda about his connection to a man named Robert Paisola. (*Id.*, Ex. 10, 11.) IPA had sued Paisola for publishing defamatory information about IPA on the

Internet and won a preliminary injunction; ultimately IPA and Paisola entered into a consent

decree enjoining Paisola from disseminating false information about IPA's activities.[2] Not

wanting to "say[] something that the Defendants could later manipulate for their benefit," Reda

ended the call. (Pls.' Br. at 9.) Cherry followed up this conversation with a letter to Reda stating

that Reda's name appeared on one of Mr. Paisola's anti-IPA websites and warning him that

"[IPA] will move vigorously to enforce th[e] injunction against all who fall within its terms."

(*Id.*, Ex. 11.)

The most recent actions that Reda construes as harassment occurred in January 2008.

First, IPA filed a lawsuit against Reda in the Circuit Court of Cook County alleging that Reda

was publishing defamatory materials about IPA on a website he controls. (*Id.*, Ex. 13.) Reda's

position appears to be that the lawsuit must be a form of harassment or intimidation because, he

claims, the statements published on the website are clearly privileged under Illinois's "fair report"

and "litigation" privileges. Next, at the parties' Rule 26 conference on January 16, 2008, there

was a discussion between Cherry and Reda. Reda says that Cherry accused him of contacting

IPA employees and telling them that they could become defendants in this lawsuit if they did not

stop working with IPA. Reda denied that he was. This exchange is confirmed in a letter from

Cherry to Reda dated January 18, 2008. (Pls.' Br., Ex. 17.) Reda also made a remark during the

Rule 26 conference to the effect that he was meeting that day with the Illinois Attorney General

in order to assist in a criminal prosecution or investigation of IPA. Cherry referred to this remark

in a letter dated January 18, 2008, which states: "I believe this statement was inaccurate and . . . I

---

[2] The facts of IPA's case against Paisola are set forth in Judge Bucklo's Memorandum
Opinion and Order of November 14, 2006. *See Int'l Profit Assoc., Inc. v. Paisola*, 461
F. Supp. 2d 672 (N.D. Ill. 2006).

urge you to be careful about statements that you make about IPA which are not true and which could harm its business." (*Id.*) According to Reda, this letter "is an outright threat of further litigation against Mr. Reda if he cooperates with the Illinois Attorney Generals [sic] Office in there [sic] multiyear investigation of Defendants [sic] Enterprises." (*Id.* at 13.)

## D.    Intimidation of Plaintiffs

Finally, Plaintiffs allege that they themselves have been intimidated because they are named as defendants in IPA's defamation case against Mr. Reda. Like Mr. Reda, they believe that IPA's claim is meritless because the statements on the "ipalawsuit.com" website are covered by a litigation privilege and/or a "fair report" privilege. Therefore, Plaintiffs argue, the lawsuit can only be seen as an attempt to harass and intimidate them.

## E.    Relief Sought

In their original motion, Plaintiffs sought an order from the Court that would (1) state that "any and all witnesses may communicate freely with counsel for Plaintiffs," notwithstanding any confidentiality agreements with any of the Defendants or with IPA; (2) bar the enforcement of any confidentiality agreement based on communications with Plaintiffs' counsel; (3) bar John Burgess, Tyler Burgess, or their agents from contacting any of their former employees; (4) bar John Burgess and his attorney from threatening to sue any witness for communicating with Plaintiffs' counsel; and (5) bar Mr. Cherry from threatening to file suit against Mr. Reda, his associates, or his agents. (Pls.' Br. at 1.) When the Court pressed Plaintiffs at oral argument to articulate their request for relief more precisely, Plaintiffs retreated from the sweeping language

of their motion and requested that the Court enter an order prohibiting Defendants or IPA from suing, or threatening to sue, based on disclosures to Plaintiffs' counsel of information that is not legitimately confidential business information because it relates to a scheme of racketeering or fraud.

## II. Analysis

As reflected in the Court's presentation of Plaintiffs' allegations in Section I above, Plaintiffs' accusations of intimidation and harassment fall into several categories. These can be classified as (1) threats of lawsuits to enforce confidentiality agreements against former employees; (2) other threats against former employees; (3) attempts to intimidate Mr. Reda, the attorney, through legal proceedings; and (4) an attempt to intimidate Plaintiffs by including them as defendants in the defamation suit against Mr. Reda. The Court considers each form of alleged intimidation separately.

### A.    Category 2: Non-litigation Threats Against Former Employees

Plaintiffs allege that Defendants John and Tyler Burgess have threatened former IPA employees in order to prevent them from providing information to Plaintiffs. This allegation is without evidentiary support because Plaintiffs rely on declarations that are either incompetent (because they are not based on personal knowledge) or irrelevant (because they concern events with no logical or temporal connection to this case).

1.    Plaintiffs' "common knowledge" evidence is inadmissible.

In several of Plaintiffs' declarations, former employees state that "it was common knowledge" that the Burgesses would take revenge on people who made them angry. This phrase appears in Valerie Ramsdell's declaration when she states that "[i]t was common knowledge amongst myself and Mr. Burgess's other employees that he was an artist in the emotional and intellectual manipulation of people . . . and that if you crossed Mr. Burgess, he would say or do anything." (Pls.' Br., Ex. 8.) Later, Ramsdell says that "[i]t was common knowledge among myself and Mr. Burgess's other employees that he followed up his threats and would file suit against anyone." (*Id.*) These exact phrases also appear, word for word, in Justin Hammang's declaration. (*Id.*, Ex. 7.) Similarly, Ramsdell, Hammang, and Toby Marie Walker declare in unison that "each person who hears [Mr. Burgess's threats] reacts to Mr. Burgess's reputation and understands them to be an attack on whatever it is that they fear most."[3] (*Id.*, Ex. 6, 7, 8.) Apparently, the inference Plaintiffs would like the Court to draw from this testimony is that, because "each person" is aware of the "common knowledge" that the Burgesses are ruthless in quashing dissent, it is likely that they are intimidating witnesses in this case.

But the Court will not take this testimony into account, because Plaintiffs' "common knowledge" evidence about the Burgess's allegedly ruthless ways is pure hearsay and is therefore inadmissible. *See, e.g., Rait v. Oshkosh Architectural Door Co.*, No. 05 C 1271, 2007 WL 702806, *1 (E.D. Wis. March 2, 2007) (finding that "'common knowledge' or, to be more precise, workplace rumor, constitutes inadmissible hearsay"); *White v. Whitman*, No. 99 C 4777, 2002

---

[3] These similarities are even more remarkable in light of the fact that Walker's declaration focuses on a different Mr. Burgess (Tyler) than the declarations of Hammang and Ramsdell (John).

- 9 -

WL 776589, *15 (S.D.N.Y. April 26, 2002) (testimony that it was "common knowledge" that employer was not promoting black workers was inadmissible to show discrimination). Similarly, the testimony about what "each person" knows or feels about Mr. Burgess and his alleged threats runs afoul of the most basic requirement of competent testimony—the requirement of personal knowledge. *See* Fed. R. Ev. 602. Unless they are mind readers, the declarants cannot possibly have a non-hearsay basis for the knowledge they claim; the proper witnesses would be the people whose feelings of dread Plaintiffs' witnesses describe. Therefore, the Court will not consider these declarations.

2.    Plaintiffs' other evidence does not demonstrate intimidation related to this case.

Some of Plaintiffs' declarations contain some testimony that is based on personal knowledge and is not hearsay. However, this testimony does not show that Defendants have intimidated witnesses or potential witnesses in this case. Much of Plaintiffs' evidence is simply irrelevant. Toby Marie Walker's declaration states that Tyler Burgess told her in 2004 that her life would be made miserable if she "didn't keep quiet" regarding allegations of sexual harassment at IPA, which at that time was the subject of an EEOC investigation and lawsuit. (Pls.' Br., Ex. 6.) While Walker states that she has been "living in fear of [Burgess's] reprisals," she does not allege that she has been threatened in the instant case, or even that she has had any communication with any of the Defendants regarding this case. (*Id.*) Similarly, Valerie Ramsdell's testimony that John Burgess has important tax records that belong to her is irrelevant without any indication that he has taken some action related to her involvement in this case. (*Id.*,

Ex. 8.) Plaintiffs' brief also makes much of a letter Ramsdell received from John Burgess warning her that competing with IPA could lead to legal action. However, this "threat" lacks any logical connection to her involvement in this case. Plaintiffs initiated this suit in March 2007. On May 1, when the letter was written, only the complaint—which does not mention Ramsdell—had been filed. There is no evidence that Ramsdell was involved in the case at all at that time. Therefore, there is no chance that Burgess's letter was some form of retribution for her involvement. Burgess and IPA cannot be barred from enforcing valid contractual rights against former employees simply because Plaintiffs might possibly want their testimony in the future.

Ramsdell and Hammang's testimony that they and other co-workers were repeatedly threatened during the time that they worked for Burgess lacks a logical connection to this case because Ramsdell stopped working for Burgess in 2005, Hammang in 2003. (*Id.*, Ex. 7, 8.) It is obvious that threats made at least two years prior to the inception of this litigation cannot have been made with the intent to interfere with this case, assuming they were made at all. The only reasoning that could link the allegations of past threats or harassment to the allegations in the current case would be the inference that John and Tyler Burgess have a propensity for threatening employees and have acted in accordance with that propensity in this case. But evidence of prior bad acts "to prove the character of a person in order to show action in conformity therewith" is generally inadmissible under Federal Rule of Evidence 404(b). While an exception exists when prior acts are offered to prove a pattern of conduct or *modus operandi*, the Seventh Circuit requires that there be a "singular strong resemblance" between the two sets of actions, not merely a generic similarity. *See U.S. v. Thomas*, 321 F.3d 627, 635 (7th Cir. 2003) (internal quotes omitted). Here, Plaintiffs' evidence amounts to "the Burgesses have threatened people who made

- 11 -

them mad." This is far too general to establish a pattern of conduct with any probative value. Therefore, Plaintiffs' allegations of past threats with no logical connection to the current case are inadmissible.

Tyler Gordon Frandsen's declaration contains some evidence that is logically connected to this litigation, but it does not support a finding that he has been harassed, threatened, or intimidated in order to change his testimony. Frandsen alleges that John Burgess called him on October 25, 2007, after Frandsen provided a declaration in support of Plaintiffs' brief opposing Defendants' motion to dismiss. (Pls.' Br., Ex. 4.) Frandsen's description of the conversation is studded with conclusory statements reflecting his interpretation of the phone call and Burgess's intent in calling him, such as "I understood that Burgess's only purpose was to intimidate, to corruptly persuade, to threaten, and to harass me." (*Id.*) This non-factual testimony must be disregarded. The facts that Frandsen relates indicate, at best, that Burgess was angry with Frandsen for testifying in support of Plaintiffs. Burgess allegedly said that Frandsen's statements "made no sense," were "crazy," and would "unfairly discredit" IPA and Frandsen's "friends" at IPA. (*Id.*) He said that Plaintiffs' claims were "bogus." (*Id.*) On a personal level, he allegedly said that Plaintiffs' counsel was a cocaine addict, accused Frandsen of disloyalty, and called him a "loser" and a "baby" who needed to wear diapers. (*Id.*) The Court finds that this testimony does not demonstrate harassment or witness intimidation.

It is not illegal *per se* for a party (as opposed to an attorney) to contact a represented party without the knowledge or consent of counsel, so long as the party does not attempt to harass, threaten, or improperly influence that party's testimony. *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, No. 00 C 5658, 2002 WL 1433717, *7 (N.D. Ill. July 2, 2002).

Since Burgess could have contacted even a represented party, it is clear that he was not barred from all contact with Frandsen, a mere witness. None of the statements that Frandsen attributes to Burgess suggest that Burgess was trying to suborn perjury by persuading Frandsen to testify falsely or that Burgess was trying to dissuade Frandsen from providing truthful testimony. In fact, Frandsen's account of the conversation indicates that Burgess believed Frandsen's testimony to be false and was confronting him about his "crazy" allegations. There is no evidence that Burgess used threatening words or indicated that something would happen in the future if Frandsen continued to cooperate with Plaintiffs. While Burgess's "diaper" and "loser" remarks may have been insulting, the focus of the Court's inquiry is witness harassment, not witness disparagement. It is conceivable that repeated phone calls of this type could become a serious nuisance, but Frandsen only alleges one call lasting a matter of minutes. Without any evidence that Burgess called Frandsen "with the intention of dissuading [him] from testifying," or that he actually did dissuade him, *see Ty Inc. v. Softbelly's Inc.*, No. 00 C 5230, 2005 WL 326974, *5 (N.D. Ill. February 9, 2005), Plaintiffs have not shown that Frandsen was intimidated, threatened, or harassed.

### B.     Categories 3 and 4: Intimidation of Plaintiffs and Plaintiffs' Counsel

Plaintiffs allege that Defendants are trying to intimidate them and their attorney, Mr. Reda. This claim is based on IPA's defamation lawsuit in the Circuit Court of Cook County, which names Reda and the Plaintiffs as defendants. The lawsuit alleges that Reda and the Plaintiffs have defamed IPA through statements published on a website, www.ipalawsuit.com, that they control. Plaintiffs say that the website merely reproduces the pleadings from this case,

sometimes in "abridged" form. Plaintiffs believe that Illinois law so clearly privileges the communications on the website that IPA's lawsuit can only be understood as an attempt to harass and intimidate them.

Essentially, Plaintiffs ask the Court to rule on the merits of IPA's state court case in order to find that Defendants, acting through IPA, brought the suit for the sole purpose of harassment. The Court sees no reason to do so. First, the plaintiff in the defamation case, IPA, is not a party to the case that is before this Court. This merely underscores the obvious point that the proper venue for Plaintiffs and Mr. Reda to make their arguments about the allegedly glaring defects in IPA's case is the Cook County court where that case is currently pending. Like federal law, Illinois law provides procedures to dispose of claims that are insufficient as a matter of law and allows motions for summary judgment. *See* 735 ILCS 5/2-619; 735 ILCS 5/2-1005. Illinois law also provides a mechanism to punish those who bring claims that have no basis in law or fact for the purpose of harassment. *See* Illinois Supreme Court Rule 137. Plaintiffs should avail themselves of these state law procedures if they are confident in their assessment of IPA's defamation case.

A further reason to reject Plaintiffs' argument is the lack of any effective remedy in this Court for IPA's allegedly vexatious lawsuit. Assuming that the Court agreed that the lawsuit was a form of harassment, what could it do? The Anti-Injunction Act, 28 U.S.C. § 2283, prohibits this Court from enjoining a pending state court action, with several exceptions that must be construed narrowly. *See Zurich American Ins. Co. v. Superior Court for the State of California,* 326 F.3d 816, 824-25 (7th Cir. 2003). Furthermore, even where one of the exceptions applies, an injunction will only issue if there is no adequate remedy at law. *Id.* at 825. Plaintiffs have an

adequate remedy in the form of state court procedures, as discussed above. Therefore, an injunction is out of the question. Non-injunctive relief, while not barred by the literal terms of the Act, would transgress its spirit, which is to avoid "needless friction" between the federal and state court systems. *Id.* at 824 (quoting *Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs.*, 398 U.S. 281, 286-87 (1970)). There is simply no rational reason for the Court to interject itself into a case that is pending in a state court when state procedures provide a simpler and more appropriate solution. Therefore, the Court rejects Plaintiffs' claims of harassment based on IPA's defamation case.

Mr. Reda's additional claims of harassment and intimidation fail. The telephone call he received from Mr. Cherry and the letter promising to enforce the injunction that was entered in IPA's lawsuit against Robert Paisola do not constitute harassment. First, the letter and phone call—even if, as Reda notes, the call came in the middle of a Bears game—are so *de minimis* in terms of their impact that the Court finds it hard to believe that they could ever amount to actionable harassment, particularly because Reda does not allege any threats other than the threat to enforce the injunction from the Paisola case. Furthermore, there is no indication that Mr. Cherry acted in bad faith. While he denies representing Mr. Paisola, Reda does not deny that his name appeared on a website operated by Mr. Paisola or that Mr. Paisola was subject to an injunction prohibiting him from publishing defamatory statements about IPA on the Internet. Under the circumstances, IPA had every right to contact Reda through Cherry in order to ascertain whether Reda was participating in violating the court order and to warn Reda that IPA would act to protect its rights under the injunction.

The ARDC complaints lodged by IPA's former attorney and assistant director likewise do not amount to harassment or intimidation. While he characterizes the reports as illegitimate now, Mr. Reda's own correspondence with the ARDC acknowledged that his Internet postings could easily have been mistaken for an improper solicitation of clients. (Pls.' Br., Ex. 9.) In the Court's view, this precludes Reda from asserting that the ARDC complaints were merely an attempt to harass him. In any event, this Court will not take actions that could chill complaints of unethical conduct to the ARDC. The ARDC itself is equipped to deal with any false complaints it encounters. Finally, Cherry's letter of January 18, 2008, does not constitute harassment. In the letter, Cherry says that he believes Reda is falsely claiming to be cooperating with the Illinois Attorney General's office on an investigation of IPA, and warns Reda against making untrue statements about IPA. (Pls.' Br., Ex. 17.) Contrary to Plaintiffs' claim, the letter does not threaten Reda with legal action for cooperating with the Attorney General. Rather, the letter is predicated on Cherry's belief that Reda is *not* cooperating with the Attorney General, and implicitly threatens him with legal action if he continues to *claim* falsely that he is. The Court finds no unlawful harassment in this communication.

## C.    Category 1: Threats to Enforce Confidentiality Agreements

Finally, the Court addresses Plaintiffs' claim that Defendants are intimidating witnesses by threatening to sue them based on confidentiality agreements that they signed in connection with their employment at IPA. As discussed above, Plaintiffs would like the Court to enter an order enjoining Defendants from enforcing, or threatening to enforce, IPA's confidentiality

agreements against former employees who are providing relevant information to Plaintiffs. This request faces several insurmountable problems.

The first, most basic, problem with Plaintiffs' request for injunctive relief is that IPA, not Defendants, has the right to enforce the confidentiality agreements. IPA is not a party to this proceeding, having been voluntarily dismissed from this case. While Defendants are closely connected with IPA, IPA is a corporation and therefore a separate legal entity. This Court "may not enjoin non-parties who are neither acting in concert with the enjoined party nor are in the capacity of agents, employees, officers, etc. of the enjoined party." *U.S. v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998) (citing Fed. R. Civ. P. 65(d)). Even assuming that Defendants conceded that IPA is an alter ego of the individual Defendants (which they do not), IPA would still be entitled to notice and an opportunity to be heard before it could properly be enjoined from enforcing its confidentiality agreements. *See Lake Shore Asset Mgmt. Ltd. v. Comm. Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007). Plaintiffs' conundrum is as follows: in order to be effective, the order Plaintiffs seek would have to encompass IPA, which would be inappropriate given IPA's non-party status. Conversely, an order that only embraced the individual Defendants would be ineffectual, since IPA could still enforce its confidentiality agreements.

Beyond the fact that the proper party is not before the Court, the Court finds that the order Plaintiffs seek would be impossible to enforce. Plaintiffs do not argue that IPA's confidentiality agreements with its employees are unenforceable under all circumstances. Rather, they argue that the agreements cannot be used to block communications that do not reveal legitimate proprietary information because they relate only to the fraudulent racketeering activity Plaintiffs

allege in their complaint. On a conceptual level, the distinction that Plaintiffs seek to draw is legitimate. Courts have recognized that confidentiality agreements cannot be used for "concealment of information relating to potential improprieties on the part of the employer," *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441, 445 (S.D.N.Y. 1995), while at the same time rejecting "a sweeping rule that renders confidentiality agreements unenforceable such that former employees may initiate contact with private litigants and disclose confidential information or trade secrets." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 920 (D. Nev. 2006). The difficulty is that the Court cannot see how the order Plaintiffs seek could possibly function in the abstract, without information about a specific former employee/potential witness and the information that individual planned to disclose.

On the other hand, if a specific individual could be identified, Plaintiffs could simply subpoena that individual, obviating the need for an injunction. Defendants do not, and cannot, argue that their confidentiality agreement could be used to prevent an individual from providing testimony under a subpoena. *See E.E.O.C. v. Severn Trent Svcs., Inc.*, 358 F.3d 438, 442 (7th Cir. 2004) (private contracts cannot trump government subpoenas). Plaintiffs' only argument in response to this seemingly obvious solution is that there may be potential witnesses whose identities are unknown and who will not come forward for fear of being sued. Essentially, the only evidence of the agreements' chilling effect is the absence of evidence. This argument begs the question, because it requires the Court to assume that the failure of former employees to emerge as witnesses can only be attributed to the improper chilling effect of the confidentiality agreements, rather than some other reason such as loyalty to a former employer, mere indifference, or the non-existence of the evidence Plaintiffs seek. Furthermore, Plaintiffs'

attorney admits that he is aware of "over 400 witnesses" and speaks with an average of five

witnesses every day. (Pls.' Reply, Ex. 20.) This abundance of witnesses undermines any claim

that IPA's confidentiality agreements are preventing Plaintiffs from obtaining information.

Therefore, the Court concludes that Plaintiffs cannot make the necessary showing that

"irreparable harm" will occur if the injunction they seek is denied. *See Old Republic Ins. Co. v.*

*Employers Reins. Corp.*, 144 F.3d 1077, 1081 (7th Cir. 1998).

Plaintiffs' reliance on Judge Gottschall's opinion in *E.E.O.C. v. International Profit*

*Associates* is misplaced. In that 2003 opinion, Judge Gottschall ruled that IPA could not threaten

to sue one of its former employees for breach of a confidentiality agreement based on his

cooperation with an EEOC investigation of sexual harassment at IPA. *See Int'l Profit Assocs.*,

2003 U.S. Dist. Lexis 6761, at *5-6. The most obvious distinction between the two cases is that

in the earlier case, the EEOC had identified a specific witness with specific information to share.

As discussed above, Plaintiffs in this case are asking the Court to operate in the abstract. The

Court also finds it significant that Plaintiffs are not the EEOC. The EEOC is a governmental

agency; therefore, cooperation with the EEOC's investigation is akin to compliance with a

subpoena: both bear the stamp of governmental authority. As discussed above, Plaintiffs are free

to obtain any testimony they desire via subpoena. Furthermore, the EEOC's entire reason for

being is to enforce employment discrimination laws, so it is reasonable to assume that any

communication between an employee and the EEOC relates to employment discrimination rather

than legitimate proprietary business information. The same is not necessarily true for a private

litigant, who may seek to expose proprietary information unrelated to unlawful activity either for

personal gain (if the litigant is also a competitor) or to create an incentive for an adversary to

capitulate. It is also relevant that the EEOC is authorized to initiate a Title VII enforcement lawsuit only when it has made "a determination that reasonable cause exists to believe that an unlawful employment practice has occurred or is occurring," 29 C.F.R. § 1601.21(a), after the employer has been given notice and an investigation has been conducted, 42 U.S.C. § 2000e-5(b). Thus there is some indication in an EEOC case that evidence of unlawful activity exists. Because private litigants are not similarly restricted, there is less reason to assume that former employees will have evidence of unlawful conduct by the employer. For all of these reasons, Plaintiffs' arguments based on Judge Gottschall's opinion in the EEOC case are unpersuasive, and their request for an order barring Defendants or IPA from threatening to enforce their employee confidentiality agreements is denied.

### III. Conclusion

For the reasons set forth above, Plaintiffs' Amended Motion for a Protective Order Related to Intimidation is denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: March 7, 2008.