```
IN THE UNITED STATES DISTRICT COURT
  FOR THE NORTHERN DISTRICT OF ILLINOIS
           EASTERN DIVISION
```

| | |
|---|---|
| **AMARI COMPANY, INC., et al.** | ) |
| Plaintiffs, | ) ) |
| v. | ) No. 07 C 1425 |
| **JOHN BURGESS, et al.** | ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Many moons ago, plaintiffs filed a complaint alleging, *inter alia*, violations of the RICO statute, 28 U.S.C. § 1962. Now before me--several years, multiple amended complaints, and an incredible amount of motion practice later--is defendants' motion for summary judgment on the only remaining counts in the complaint, which assert violations of 18 U.S.C. §§ 1962(c) and (d). For the reasons that follow, their motion is granted in part.

I.

To prevail under § 1962(c), plaintiffs must ultimately prove that defendants, being employed by or associated with the entities sometimes referred to in this litigation as the "Non-Party Corporations," which I will refer to collectively here as "IPA," conducted or participated in the conduct of those entities' affairs "through a pattern of racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232-33 (1989). The

essential elements of a this claim are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S. Ct. 3275 (1985). To prevail under § 1962(d), plaintiffs must further prove that defendants conspired to commit the foregoing violation.

The "racketeering activity" on which plaintiffs' complaint is premised is mail and wire fraud. *See* 18 U.S.C. §§ 1341, 1343. This type of RICO allegation requires plaintiffs to establish that defendants (1) have participated in a scheme to defraud and (2) have mailed or knowingly has caused to be mailed a letter or other material for the purpose of executing the scheme. *Richards v. Combined Insurance Co. Of America*, 55 F.3d 247, 249-50 (7th Cir. 1995). Although neither side's briefing is remotely helpful in elucidating whether plaintiffs' evidence is sufficient to raise a triable issue in view of the foregoing standards, my own review of the record--though the record, too, is utterly confused--minimally satisfies me that a jury could find in plaintiffs' favor.

Although each plaintiff recounts an individual tale of woe that is unique in some of its details, the basic story of plaintiffs' collective experience with IPA follows. Plaintiffs' first face-to-face contact with IPA was when a salesperson known as a Senior Area Manager ("SAM") showed up at their door, ostensibly (and sometimes, but not always, genuinely) for a previously scheduled appointment. The SAMs explained that IPA is a prominent

2

and fast-growing business consulting firm endorsed by distinguished public figures, including three former Presidents of the United States, that specializes in consulting to small to medium-sized businesses. The SAMs then presented the panoply of services IPA provides and explained how each proceeds: The first step in any engagement is to have a Business Analyst ("BA") visit the client, obtain and review the company's financial and other relevant information, and provide a "comprehensive" diagnosis of how the company is performing and where improvements can be made. The SAMs explained that IPA's BAs are highly experienced business people generally, and that IPA assigns BAs to particular jobs based on the BA's expertise in the client's specific industry or field.

The SAMs then explained that during the BA's visit, he or she would collect substantial company information and communicate frequently with IPA's home office via phone and fax to consult with additional experts (including during the so-called "Council Calls," discussed below), and to access information for a comparative business analysis. At the conclusion of the business analysis (or "survey" as it is more frequently called), the BA would present his or her findings, which would reveal any deficiencies in how the client's business was run, and would propose recommendations that may or may not include hiring IPA's Consulting Services for a second engagement. The client would be billed for the survey but would only have to pay if it was satisfied with the results. All

of the plaintiffs contracted for surveys, which all culminated in variations on the same, dire warning: the client's business was on the brink of imminent failure due to poor management controls. Luckily, however, the surveys also revealed a quick and efficient path to salvation: IPA's expert consultants could begin work the following day to turn the client's business around quickly and efficiently.

Plaintiffs all contracted for IPA's consulting services.[1] Within a day or two, a cadre of IPA employees (at least two and as many as four), billing by the hour, arrived at plaintiffs' businesses to begin their consulting projects. The consultants typically spent the first day gathering financial information and faxing it back to IPA's headquarters, and preparing an apparently customized "project plan," followed by a "Value Enhancement Program" with which to begin the project. The latter document typically provided a list of objectives, strategies, or improvements that were necessary to improve the client's business results.

Plaintiffs' descriptions of the consultants' concrete activities over the course of the following weeks are generally vague, but all plaintiffs assert that it became increasingly clear that little or no progress was being made with respect to the items

---

[1] I use "IPA's consulting services" as a general description of the post-survey services offered by IPA and its related businesses.

identified in the Value Enhancement Program; that the supposed "experts" who performed the surveys had little to no experience in the relevant fields, and the consultants had no idea how to implement the recommended changes; that IPA could not substantiate either its endorsements by public figures or its claim to legions of satisfied customers; and that the bulk of the consultants' work product consisted of boilerplate "templates" that were not customized to address the problems identified in the surveys.[2] Plaintiffs later discovered, moreover, that a number of the representations made by the SAMs and the BAs, which plaintiffs had

---

[2]This is not an exhaustive list of plaintiffs' complaints. Defendants are quick to point out that despite the laundry list of grievances in their affidavits, plaintiffs signed off on weekly Value Enhancement Reports ("VERs"), which generally reflected some measure of satisfaction with--and occasionally outright praise for--the consultants' work. Plaintiffs' generic response (which appears verbatim in their respective affidavits) is that the VERs were "glowing but false accounts of progress." Standing alone, I would not be inclined to accord much significance to the naked assertion that the VERs were "false." But, in the context of more specific statements about the consultants' performance, I conclude that plaintiffs have sufficiently raised a factual dispute. *See, e.g.*, Decl. of Dennis Kao, Pl.'s L.R. 56.1 Statement, Exh. 13 at 15 ("By December 8, 2005, 416 hours had been billed - way over the project limit of [360]. Very little had been accomplished save to make Compsolution utterly chaotic, as described [in discovery materials]. The special expert in QuickBooks, Beaudette, was not and he nearly destroyed Compsolution's bookkeeping system. To cover his incompetence, he lobbied us to fire our accountant. Little or no work product had been supplied. IPA's personnel admitted as much and came back for an eighth week...at no charge, at which time they dumped most of IPA's 'work product' on us." Plaintiff also testified that IPA's "work product" was "boilerplate[,] generated from templates and had no particular relation to the 'problems' identified by [the BA]."

relied upon in deciding to engage IPA for consulting services, were misleading or untrue.

## II.

While plaintiffs' generally sloppy drafting and frequent citation to portions of the record not included in their exhibits in opposition to defendants' motion nearly led me to conclude that they had no chance of prevailing on their claims, their shortcomings were matched by defendants' failure to raise a single properly reasoned argument in support of their motion. The first argument defendants attempt is that plaintiffs cannot prove the predicate acts of mail and wire fraud. If properly supported, this argument would indeed sound the death knoll for plaintiffs' claim. But defendants' disordered pronouncements in putative support of their theory all miss the mark. For example, defendants insist that "there is no violation of RICO because defendants are engaged in a lawful business with legitimate business practices and a legitimate business model." This argument is unavailing because plaintiffs need not establish that IPA's entire business is unlawful or illegitimate; what they must show is that defendants engaged in a "pattern of racketeering activity" in conducting IPA's business. This means they must identify at least two related acts of mail and wire fraud that "amount to or pose a threat of continuing criminal activity." *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1048 (7th Cir. 1998) (quoting *H.J. Inc. v.*

*Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). A plaintiff may satisfy this requirement by showing "that the 'predicate acts or offenses are part of an ongoing entity's regular way of doing business.' *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir. 1992)(quoting *H.J. Inc.*, 492 U.S. at 242-43).

None of defendants' arguments even purports to examine a) whether the conduct plaintiffs attribute to IPA employees constitutes mail or wire fraud, or b) whether the conduct constitutes a pattern.[3] On the first issue, "[i]t is well

---

[3] As best I can follow defendants' arguments, they appear to be variations on the following themes: 1) defendants' business is legitimate; 2) plaintiffs' claims properly sound in contract, and do not amount to violations of RICO; and 3) plaintiffs did not suffer any injury. The first theme does not establish an entitlement to relief for the reason noted above. The second theme simply misreads plaintiffs' claims, possibly in an effort to shoe-horn the claims into a legal framework with which IPA has apparently had some success in state court. And the third theme--that plaintiffs suffered no injury--appears to rest entirely on plaintiffs' apparent acknowledgment, in VERs (*see* fn. 2, infra) and in "satisfaction letters," that plaintiffs benefitted from IPA's services in some way. This argument also does not establish defendants' entitlement to summary judgment. To begin with, it is not self-evident that plaintiffs cannot, as a matter of law, have suffered an injury cognizable under RICO even if they also benefitted from IPA's services, and defendants have not made any argument along those lines. (Their citation to *Hexagon Packaging Corp. v. Manny Gutterman & Associates, Inc.*, 120 F. Supp. 2d 712 (N.D. Ill. 2000), which does not even direct me to any particular page or portion of that lengthy decision, plainly does not support this broad proposition). Moreover, the statements on which defendants rely do not, contrary to defendants' suggestion, constitute legally binding admissions, even if plaintiffs do not dispute having read and signed the documents in question. While certainly defendants are entitled to probe plaintiffs' putative earlier statements at trial, plaintiffs, too, are entitled to address any apparent inconsistencies between those statements and other evidence in the record.

7

established that the crime of mail fraud does not encompass all the strict requirements of common law fraud." *Richards*, 55 F.3d at 251. Instead, "the words 'to defraud' in the mail fraud statute have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id*. at 252 (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987) (internal quotation marks and citation omitted)). The wire fraud statute has a similar focus, making it a crime to use the interstate wires in "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. Accordingly, while plaintiffs must establish "a scheme to defraud," as well as the "intent to implement such a scheme," they need not establish a "misrepresentation of present fact" as they would under the common law. *Richards*, 55 F.3d at 252.

Even putting aside plaintiffs' contested expert reports (which I have not considered for the purpose of ruling on this motion), the record reveals several concrete examples of defendants' trickery, and the extent to which this trickery was apparently institutionalized and incorporated into IPA's standard sales and business practices suggests that it was intentional, not

inadvertent.[4] The so-called "Council Call" made by IPA's Business Analysts is a good example. The affidavit of Nancy Miller (a twelve-year employee of IPA, who testified based on her personal experience) explains that Business Analysts arriving at a client site are required to present a scripted speech known as the "Institutional," in which they explain, among other things, the survey process. According to the speech (which appears in the record as part of IPA's 2000 Business Analyst Training Manual), the Business Analyst explains, "I'll be making several long distance calls back to my office in Chicago.... I'll be calling and asking to have my Council assembled, which is a group of individuals who have expertise in your industry.[5] I rely on my Council in assisting me, not only in identifying problems, but also in making

---

[4]Defendants argue that plaintiffs' case rests upon the opinions of their experts but acknowledge that the expert reports are "loosely supported" by the declarations of plaintiffs themselves. Defendants have it wrong. While defendants' criticism of plaintiffs' declarations as "carbon-copied" and "factually inaccurate" is justified in some respects, the declarations are not so deficient as to warrant complete disregard (nor do defendants go so far as to suggest they should be stricken), and the experiences they describe--however carelessly at times--are sufficient, in view of other evidence in the record, to enable a reasonable jury to find in plaintiffs' favor, with or without the support of plaintiffs' experts.

[5]Apparently, at some point Business Analysts referred to their "Research Staff" rather than their "Council," but with the same representation the "Research Staff" was "a group of individuals who have expertise in your industry" and assist in "identifying problems" and "making recommendations as to how we overcome the problems." *See*, e.g., Pl.'s L.R. 56.1 Statement, Exh. 4 at p. 22 para. 7; Decl. Of Dennis Kao, Pl.'s L.R. 56.1 Statement Exh. 13 at 9.

recommendations as to how we overcome the problems." After gathering information about the client's business, the Business Analyst makes the previously explained "Council Call," in the client's presence, ostensibly discussing the client's problems with a group of experts. According to the Miller Affidavit, however, these calls were a "charade." Pl.'s L.R. 56.1 Statement, Exh. 24 at ¶ 41(D). In fact, there was no council of experts at all. If the Business Analyst was experienced, his or her call was simply placed on hold while he or she pretended to speak to a group of experts. If the client insisted on speaking to the "Council," an IPA employee would have to "scramble to find anyone who happened to be in the office to pretend to be part of this 'council of experts.'" *Id*.

While I may be inclined to agree with defendants that certain of the practices plaintiffs complain of fall within the broad category of "puffery," it is difficult to see how the Council Call "charade" can be characterized as anything other than a "dishonest method" of achieving a sale.[6] The evidence reveals that the calls

---

[6] The "Council Call" charade is qualitatively different from the "puffing" and expressions of opinion that courts have declined to find fraudulent in the cases defendants cite. *See Royal Business Machines v. Lorraine Corp.*, 633 F.2d 34, 42 (7th Cir. 1980)(statements that machines were "high quality" and that frequency of repair was "very low" amounted to "puffing"); *Lefebvre Intergraphics v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1366 (N.D. Ill., 1996) (statement that printing press "would produce commercially acceptable work" was merely "dealer talk"). Moreover, these cases dealt with state law claims of fraudulent misrepresentation, not federal mail and wire fraud, which reach

10

were specifically designed to "condition" the potential customers to believe that his or her business suffered from "deficiencies" that additional IPA services could repair. As IPA's 2004 Survey Training Manual explains,

> The purpose of the call is to have the client overhear what the analyst is saying to the SSD.[7] It is to merchandise and further implant in the client's mind what his problems are and what these problems are costing him.... If the SSD asks a question, it is for the purpose of giving the analyst a "talking point." The questions should not be answered yes or no, as this answer does not condition the client. The analyst must expound on the question so that the client is conditioned that there is a deficiency in the business regarding the question posed.... This is a golden opportunity to take control, establish urgency, get a focus of the survey and agreement to the problems, and condition the client. For this reason it is mandatory that every analyst complete an Opening Research Staff Call on every job.

Pl.'s L.R. 56.1 Statement, Exh. 4 at 15.

Indeed, numerous plaintiffs have testified that when deciding whether to engage IPA for additional services, they relied on the Business Analysts' representation (along with a catalog of others later revealed to be, at a minimum, misleading) that a group of industry experts had participated in diagnosing problems with their businesses and in formulating recommendations. *See, e.g.*, Decl. of Dennis Kao, Pl.'s L.R. 56.1 Statement Exh. 13 at 9. This, one may

---

"false promises and misrepresentations as to the future as well as other frauds involving money or property."

[7] I.e., the Survey Services Director, whose function at that stage is to act as the analyst's "Wing Man, to guide you to the GO" see Pl.'s L.R. 56.1 Statement, Exh. 4 at 5.

11

reasonably surmise from the record, is precisely what defendants intended.

As for the "pattern" requirement, the evidence also reveals that Business Analysts systematically made two of these "Council Calls" on the first day of each survey performed--indeed, it was, and as far as the record reveals, still is, mandatory to do so "on every job." And the record reflects other practices that, while perhaps less glaringly deceitful individually than the "Council Call" example, could, collectively, persuade a jury that IPA's method of selling its services is based on "trick, deceit, chicane or overreaching."[8] Because all of these practices are "part of an ongoing entity's regular way of doing business," *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d at 1023, the requirement of a "pattern" of racketeering activity is also satisfied.

I conclude, however, that plaintiffs have not demonstrated that they are entitled to a jury on their claim that defendants violated § 1962(d). The whole of their argument is that defendants "sat at the top of the pyramid" of IPA employees who "perpetrated the sales scheme which they conceived and controlled." Pl.'s Opp.

---

[8]Another example is IPA's Business Analysts' standard practice of generating so-called "problem costs" that purportedly reflect rising expenses in the client's business (which, the Analyst explains, herald the imminent failure of the business), and attributing these "problem costs" systematically to poor "management controls." According to the Miller Affidavit, Business Analysts were encouraged to "fudge the data" if need be to generate "problem costs." *See* Miller Aff. At ¶ 41 (F).

12

At 6. But if the record contains evidence of who did what to "conceive[] and control[]" the alleged scheme, or evidence of any agreement among the defendants to participate in the scheme, plaintiffs have not directed me to it, and I need not scour the record searching for it. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies.").

A conspiracy to violate RICO requires "proof that the defendant, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes." *Roger Whitmore's Auto Services, Inc. v. Lake County, Ill.*, 424 F.3d 659, 674-75 (7th Cir. 2005)(citation and textual alterations omitted). Conclusory assertions "that a conspiracy *must* be present" are "wholly inadequate." *Id.* at 674 (alteration in original). Furthermore, the only authority plaintiffs cite to support their RICO conspiracy claim is a district court decision *dismissing* such a claim because the complaint contained insufficient information about the putative role of each defendant in the alleged conspiracy. *Damato v. Merril Lynch, Pierce, Fenner, & Smith, Inc.*, 878 F. Supp. 1156, 1164 (N.D. Ill. 1995). In short,

plaintiffs have not demonstrated that they could convince a reasonable jury that defendants have violated § 1962(d).

III.

For the foregoing reasons, I grant summary judgment in defendants' favor on plaintiffs' claim pursuant to 28 U.S.C. § 1962(d) claim and deny summary judgment of their § 1962(c) claim.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: July 11, 2011