**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMARI COMPANY, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 07 C 01425 |
| | ) | |
| JOHN R. BURGESS, et al., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiffs, sixteen businesses in various industries, allege that the three individual defendants used various corporate entities they controlled (which the Court collectively refers to as "IPA" unless otherwise required) in a pattern of racketeering activity that swindled Plaintiffs into purchasing expensive but unnecessary or worthless business management and tax consulting services. *See* 18 U.S.C. 1962(c). The case is in its sixth year, and the 1000-plus docket entries tell the tale of the case's tortured and contentious history. A smattering of related state-court cases in various stages of litigation has also slowed progress in this Court. Fact discovery, now closed, proceeded at a snail's pace, was hotly contested, and frequently gave rise to motions to compel or for sanctions (meritorious and otherwise). Now before the Court are seven motions to bar the testimony of sixteen proposed expert witnesses. True to form, each party contests almost every one of the other side's disclosed experts. The motions to exclude can be grouped into those based on disclosure and those based on admissibility. The Court takes them up in turn.

**A.     Disclosure Challenges**

Plaintiffs named Douglas Carpenter and Frank Baldino, both accountants, as experts for purposes of computing the consequential damages incurred by Tring Corporation and John

1

Cardullo & Sons, Inc., respectively. In their motions to strike (Dkt. ## 1013, 1015), Defendants argue that Carpenter and Baldino must be excluded because Plaintiffs' disclosure of relating to their opinions and their bases was both late and incomplete.

### 1. General Disclosure Requirements

Before expert testimony can be admitted, certain procedural thresholds must be satisfied, quite apart from the admissibility of the testimony as a matter of substance. Federal Rule of Civil Procedure 26(a)(2) requires the proponent of expert testimony to timely disclose the witness's identity, and, for retained experts, a written report that contains, among other things, a "complete statement of all opinions the witness will express and the basis and reasons for them." *Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 825 (7th Cir. 2010). The Seventh Circuit has explained that "all witnesses who are to give expert testimony under the Federal Rules of Evidence must be disclosed under Rule 26(a)(2)(A) while only those witnesses retained or specially employed to provide expert testimony must submit an expert report complying with Rule 26(a)(2)(B)." *Banister v. Burton*, 636 F.3d 828 (7th Cir. 2011) (quoting *Musser v. Gentiva Health Services*, 356 F.3d 751, 756-57 (7th Cir. 2004)). The expert disclosure requirements cannot be avoided by "elevating" to expert status a witness who was previously identified as a fact witness or person with knowledge. *See Happel*, 602 F.3d at 823. The sanction for failure to comply with the disclosure requirements is the "automatic and mandatory" exclusion of the testimony, "unless non-disclosure was justified or harmless." Fed. R. Civ. P. 37(c)(1); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005).

### 2. Discussion

The record does not contain a single clear disclosure of Carpenter and Baldino pursuant to Rule 26(a)(2). Plaintiffs do not maintain otherwise in their response to the motion to exclude;

instead they discuss various ways they believe they made Defendants aware of these experts. A September 16, 2011, letter to Defendants' counsel names Carpenter and Baldino in a paragraph entitled "Damages Experts." The letter also goes on to state that Plaintiffs had long considered Defendants to be on notice of those experts. First, Baldino's report (which had been submitted in related state-court litigation) was already in the record as an exhibit to Plaintiff's response to one of many unrelated motions filed in this case. Dkt. # 438, Ex. Q (February 11, 2009). Second, although Carpenter's final report was not yet prepared, Plaintiffs noted that they had previously listed him in their amended witness disclosure, which had been filed with the Court as an exhibit to a motion for an extension of time on October 1, 2009. In fact, Carpenter does appear on "Schedule A.3.2" of Plaintiffs' "Third Amended and Supplemental Disclosures pursuant to <u>Rule 26(a)(1)</u>" (emphasis added), listed as a witness for Plaintiff Tring, to testify about "Uselessness / Negative Impact of IPA Companies Service and Advice." Dkt. # 615-2 at 53. Despite these earlier references, it was not until October 31, 2011, that Plaintiffs emailed or faxed (they are unsure which) "final" copies of Carpenter's and Baldino's reports to Defendants.

Despite Plaintiff's creative arguments, neither the September 16 letter nor the 2009 court filings that mention Baldino and Carpenter count as disclosures pursuant to Rule 26(a)(2). "[A] party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705," and "[u]nless otherwise stipulated or ordered by the court, this disclosure must be <u>accompanied by</u> a written report—prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(A)&(B) (emphasis added).[1] Thus, at the earliest, Plaintiffs effectively disclosed Carpenter and Baldino on October 31, 2011, when they sent the reports to Defendants' counsel. Any prior mention of these witnesses—in the September letter,

---

[1] Whether these witnesses are of the sort required to file a report is not an issue in this case; they are. *See* Fed. R. Civ. P. 26(a)(2)(B).

in the Rule 26(a)(1) disclosures, or buried in the exhibits to a totally unrelated motion—was not a disclosure within the meaning of Rule 26(a)(2). Disclosure as a Rule 26(a)(1) fact witness does not suffice as an expert disclosure (to the contrary; it suggests that the identified witness will *not* be testifying as an expert, but rather as a fact witness). *See Happel*, 602 F.3d at 823. And simply naming the expert is not a complete disclosure when a report is required. The rule "mandates a complete and detailed report of the expert witness's opinions, conclusions, and the basis and reasons for them . . . and not merely the expert witness's identity"; indeed, "the expert witness's identity is a separate fact that must be disclosed in addition to the report." *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). Certainly before receiving the reports, Defendants could not have been on notice of the nature of the experts' opinions *in this case*, the bases of the opinions, and the experts' purported qualifications to render them. And timely notice is whole purpose of the rule. *See id.*

The timeliness of the disclosure will therefore be assessed by taking October 31, 2011 (or November 1, 2011, when Defendants apparently received the reports) as the disclosure date. The task is complicated because the case's scores of minute orders setting and changing deadlines for particular events—peppered heavily with the parties' motions to extend the deadlines and an endless stream of their objections—make it difficult to chart the applicable deadlines.[2] Defendants point to numerous orders setting deadlines for witness disclosures, instructing Plaintiffs to amend them, compelling answers to interrogatories, and imposing sanctions, which they insist add up to proof that disclosure of expert witnesses was due long before October 31, 2011. None of the cited orders directly says so, though. And the Court is inclined to agree with Plaintiffs that Defendants read too much into some orders; for instance, Judge Bucklo's orders

---

[2] The case was reassigned to this Court on July 17, 2012; previously, two other district judges and three other magistrate judges had been assigned.

portend a fact discovery phase to be followed by expert discovery,[3] so her deadlines for certain disclosures and depositions might have applied only to fact discovery.

But that doesn't make the disclosure of Carpenter and Baldino timely. Digging deeper, Defendants moved to bar "undisclosed" experts [Dkt. # 922] on June 1, 2011, in the midst of the briefing of their motion for summary judgment. The motion was directed at three experts—Zayas, Newman, and Boras (not the two currently at issue, Baldino and Carpenter)—upon whose declarations Plaintiff relied in responding to the summary-judgment motion. Judge Bucklo declined to consider the contested expert testimony in ruling on the summary judgment motion (*see* Mem. Op. & Order, Dkt. # 942 at 8-9 & n4), but she also denied the motion to exclude the experts as untimely. Minute Order, Dkt. # 941 (July 11, 2011).

At that time, Judge Bucklo also entered the following schedule: "*Defendants* shall have until October 1, 2011 to name any opposing experts. All depositions of experts shall be completed by November 15, 2011. Any motions to strike experts shall be filed by December 15, 2011." [4] *Id.* (emphasis added). This strongly suggests that, although Judge Bucklo considered the disclosure of Zayas, Newman, and Boras to be timely, she also considered Plaintiffs' time for disclosing experts to have passed.

On October 25, 2011, Defendants moved again to bar Plaintiffs' same three experts (Zayas, Newman, Boras) for failure to timely produce reports and appear for depositions. Dkt. # 979. Plaintiffs responded to this motion almost simultaneously with their disclosure to the defendants of the two damages witnesses, Carpenter and Baldino, but they did not advise the

---

[3] For example, Judge Bucklo and Magistrate Judge Ashman repeatedly referred to discovery being "closed" or declining to "reopen" it during the time period where they were overseeing expert discovery. *E.g.* Minute Entries, Dkt. ## 815, 820, 889, 898.  These orders make sense only if expert discovery was treated as a separate phase.

[4] Like nearly other deadline in this case, this date was later extended at the parties' request.

Court that these two additional experts were in their pipeline. In December, Judge Bucklo referred Defendants' second motion to bar to Magistrate Judge Ashman, who ultimately denied it without prejudice (along with a similar motion filed by Plaintiffs). Minute Entry, Dkt. #1002 (January 11, 2012). Then, on February 1, 2012, Magistrate Judge Ashman entered an agreed order providing for depositions of four experts *not including Baldino or Carpenter*, allowing *Defendants* time to disclose additional experts and time to supplement expert reports as needed after deposing Plaintiff's liability experts, and requiring each side to file any objections to the other's expert designations by February 27. Again, this suggests that Magistrate Judge Ashman also considered Plaintiffs to be done naming more experts, and Plaintiffs did nothing to disabuse the Court of that impression. Thus, although the parties were fighting over Plaintiff's experts Zayas, Newman, and Boras from June 2011 to January 2012, Carpenter and Baldino came to the Court's attention only in March 2012, when Defendants moved to exclude them.

This sequence of events suffices to convince the Court that the October 31, 2011, disclosure of Carpenter and Baldino was untimely. Judge Bucklo's July 11 order that rescued Zayas, Newman, and Boras from exclusion clearly contemplated that Plaintiff was done naming experts. She entered a schedule *for the defendants* to name their opposing experts. Even though no precise deadline had ever been set for Plaintiff's disclosures, it is clear that Plaintiffs' disclosures were considered closed as of July 11, 2011, just as Magistrate Judge Ashman did not contemplate the depositions of Carpenter and Baldino his February 2012 order. Plaintiffs, who not have shown themselves to be at all shy about moving to reconsider or clarify the court's orders, could have spoken up at that time and advised the court that more experts were on the way. Instead, they simply took the liberty of advising Defendants in September 2011 that they had some damages experts and finally attempted a complete disclosure on October 31, after

6

which it does not appear they took further action (other than to say generically that the experts were "available" for depositions).

Moreover, the disclosures of Carpenter and Baldino were not complete within the meaning of Rule 26(a)(2) because the experts' reports are inadequate. They are heavy on conclusions but short on analysis and lacking anything but the broadest description of the methodology used. See Fed. R. Civ. P. 26(a)(2)(B) (requiring report to contain, *inter alia*, "a complete statement of all opinions the witness will express *and the basis and reasons for them*" and "the facts or data considered by the witness in forming them")(emphasis added). For example, the Carpenter "report" is a 1-page letter that concludes "based on the books and records" that plaintiff Tring Corporation paid two "excess" fees. There is no explanation of methodology, nor any mention how these supposed consequential damages were caused by the Defendants. The Baldino report is a letter supplementing a 2006 report, presumably in another case. It appears that Baldino is comparing plaintiff Cardullo's actual profits with what it "should" have made if its relationship with two vendors had not be disrupted, and attributing the entire difference to the Defendants. Baldino assumes causation without supplying any basis for the opinion. These issues also create doubts that the testimony as summarized in the reports would be admissible, but that is not the basis of Defendants' motions, so the Court will not pursue that issue further.

The Court further concludes that the untimely disclosures are not substantially justified or harmless within the meaning of Rule 37(c)(1). First, Plaintiffs offer no justification other than blaming the Court for failing to provide clear deadlines. But Plaintiffs concede that they intended as far back as 2009 to use Carpenter and Baldino as expert witnesses—and Baldino's "preliminary" analysis dates back to 2006. Yet they did not disclose them—even after facing

7

opposition to their other three experts on grounds of timeliness—and never even supplemented their interrogatory responses which stated that they had not identified any expert witnesses. Although the Court might have provided a more definite schedule (though the unceasing flood of filings made such an exercise more challenging than it should have been), Plaintiffs were not entitled to take the ambiguity as license to trickle out their expert disclosures over a period of years, keeping the full extent of their case from Defendants and the Court.

And the failure is not harmless. This case has been dragging along for years. Allowing at this late date for still more expert depositions, and possibly the need for counter-designation of opposing damages experts, would gum up the works even more. True, Defendants could have deposed the two experts after (finally) receiving their reports, but it was not unreasonable to stand on the argument that the disclosure was untimely and/or incomplete, given the costs that they would have incurred by preparing for the depositions. Moreover, the depositions would have been based on expert reports that fell short of what is required, further handicapping the Defendants in any effort to effectively depose the authors. And now, Defendants would suffer prejudice by having to depose Carpenter and Baldino after their own experts have already been deposed; obtaining rebuttal testimony at this late stage would impose financial and other burdens that are not justified in light of Plaintiff's unjustified delay. Therefore, the motions to exclude damages experts Plaintiff's damages experts Carpenter and Baldino are granted.

**B. Admissibility Challenges**

The next groups of motions target the admissibility of proposed expert testimony. First, Defendants move to exclude the testimony of Jeffrey Newman, a tax expert, and Ricardo Zayas, an accounting expert, who propose to address how IPA (and its affiliate tax-advice business, International Tax Associates, or "ITA") gave Plaintiffs a sales pitch inaccurately describing their

services and the benefits that Plaintiffs would receive. See Dkt. ## 1011, 1017. Next, Plaintiffs move to exclude IPA/ITA employees Breeman, Clauser, and Wallis, disclosed as rebuttal witnesses to Newman and Zayas. Dkt. ## 1020, 1021, 1030, 1033. Plaintiffs further move to exclude nine other current or former IPA employees from giving expert testimony about the *bona fides* of the IPA business model and the absence of fraud in the provision of services. Dkt. ## 1019, 1032.

### 1. Admissibility Standards

Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony. Rule 702 provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

In short, the rule requires that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The principles set forth in *Daubert* apply equally to non-scientific testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999) (extending application of *Daubert* factors to engineers and other non-scientific experts). No matter the nature of the witness's expertise, the rule "establishes a standard of evidentiary reliability," "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility," and mandates that the testimony have "a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* at 149 (quoting *Daubert*, 509 U.S. at 590, 592).

In applying Rule 702 and *Daubert*, the first step must be to determine that the witness proposes to testify based on some scientific, technical, or specialized knowledge. *See Huey v. United Parcel Service, Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) (the issue of reliability does not even come into question unless it is established that the expert's opinion depends on scientific, technical, or other specialized knowledge). It is not true that anyone with "expertise" may testify as an expert; "expertise is a necessary but not a sufficient condition of admissibility under Rule 702. *Id; Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 825-26 (7th Cir. 2010).

Once the court concludes that the proposed testimony is an appropriate subject of expert testimony, it then must evaluate whether the testimony is reliable. When it comes to reliability, the focus is on the expert's qualifications in his or her field and the soundness of the methodology. The court considers a proposed expert's "full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). As for methodology, the specific (and non-exhaustive) factors that *Daubert* set forth for assessing the reliability of scientific testimony also may be considered in the non-scientific context "where they are reasonable measures of the reliability of expert testimony," but the court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.,* 526 U.S. at 152. At bottom, an "expert's opinion must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). However, reliability is separate from quality: "The soundness of the factual underpinnings of the expert's analysis and the correctness

of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718.

Another required consideration is whether the testimony will assist the trier of fact, and this is primarily a question of relevance. *Daubert*, 509 U.S. at 590. "[E]xpert testimony need only be relevant to *an* issue in the case; it need not relate directly to the ultimate issue." *Smith*, 215 F.3d at 721. Helpfulness is sometimes phrased as a matter of "fit" between the suggested testimony and the issue that it is meant to support. *E.g., Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 616 (7th Cir. 1993); *see also Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410 (7th Cir. 2005) (Expert's "test results are . . . too broad for this context and, as a result, this portion of his proposed testimony would not assist the trier of fact"). If the issue is "peculiar," expert testimony is more likely to be informative and helpful, whereas, "when the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible." *Florek v. Village of Mundelein*, 649 F.3d 594, 602-603 (7th Cir. 2011). The court does not have to exclude an expert just because the testimony may cover matters that are within the average juror's comprehension, but an expert must testify to something more than what is obvious to the layperson in order to be of assistance to the jury. *See Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998).

### 2.    Discussion

#### a.    Plaintiff's Experts Newman and Zayas

The Court first turns to Plaintiff's experts Newman and Zayas—two experts Judge Bucklo found to be timely disclosed. *See* Minute Entry, Dkt. # 941 ("Defendants' motion (922) to strike plaintiffs' expert reports on the ground of untimeliness is denied"); *see also* Mem. Op. & Order, Dkt. # 942 at 8-9 & n4. Newman is a tax attorney and certified public accountant whom Plaintiffs tapped to testify about representations, reports, and advice that IPA's tax entities

gave to certain Plaintiffs. In short, he opines that ITA prepared "Preliminary Tax Savings Illustrations" and other reports that had "no foundation, erroneously state[d] tax savings, [were] not accurately calculated, [did] not adequately disclose administrative costs, [did] not adequately disclose the risks of implementation, [were] contradictory to each other, and/or [were] not customized to each plaintiff's unique circumstances."

In moving to strike Newman's testimony, Defendants concede that Newman is qualified in his field, and it was not until their reply brief that they expressly challenged the reliability of his methodology. An argument that is raised or not adequately developed for the first time until the reply brief is waived. *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 652 (N.D. Ill. 2006). It would be unfair to Plaintiff and difficult for the Court to consider the reliability argument when the Plaintiffs had no opportunity to respond to it.

Defendants object to Newman primarily because, they say, his testimony will not assist the trier of fact in understanding the evidence or determining a fact in issue. Defendants protest that Newman's testimony primarily goes to the truth of whether Defendants made fraudulent claims and that he simply renders opinions about the Defendants' liability rather than analyzing the soundness of the tax advice provided to Plaintiffs. Defendants also set forth a long list (lettered "a" through "x") of excerpts from his report and deposition transcript purportedly demonstrating that he could not "validate" or "support" his opinions, which therefore could not be helpful to the trier of fact. In response, Plaintiffs state that Newman's testimony goes directly to whether ITA used sound principles and methods in assessing the Plaintiffs' tax outlook. They further argue that Defendants are quibbling with the factual underpinnings of Newman's testimony and the soundness of his opinions, not whether those opinions are admissible.

Despite relying heavily on the "helpfulness" requirement of Rule 702, nowhere do Defendants contend that Newman's opinions are not relevant to "an" issue in the case. *See Daubert*, 509 U.S. at 590. The Court concludes that Newman has something helpful to offer a jury called upon to gauge the soundness of the tax advice that was delivered in relation to what was promised. His testimony about the competence of the services received by Plaintiffs relates directly to the issue of whether ITA provided anything of value in exchange for the fees it generated, and whether the services corresponded to what was advertised, including the customized work-up the Plaintiffs were allegedly promised. The bulk of Defendants' objections relate more to the quality of Newman's opinions that their admissibility. *Smith*, 215 F.3d at 718. Indeed, the "a - x" list reads like a cross-examination—one that Defendants will surely perform when Newman testifies (and to which he appears vulnerable). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Moreover, whether the Plaintiffs received bona fide tax planning is an "ultimate issue" (and one appropriately within the province of a tax expert), but testimony is not objectionable on that basis alone. *See Roundy's Inc.*, 674 F.3d at 648.

Defendants fare better when they object to Newman's testimony about legal issues that will determine the outcome of the case, such as whether ITA committed fraud. *See id*. The Court will not allow such testimony. Nor is it the tax expert's province to opine about the marketing tactics of IPA and ITA, or whether the consulting services ultimately were the "swindle" Plaintiffs allege. The jury might or might not draw such a conclusion, but it will not hear Newman's legal opinion on the subject. Newman may, however, testify to any inaccuracies or deficiencies in tax advice received by any particular plaintiff. He can address whether, and in

13

what manner, any particular plaintiffs received tax services that differed from what was promised and any effects of such a discrepancy on the business. He cannot, however, extrapolate from the experience of any particular client to opine generally about ITA's practices.

Defendants next challenge Plaintiffs' expert Ricardo Zayas, a certified public accountant and certified fraud examiner. His proffered testimony focuses on the "Business Analysis" or "Survey" received by all Plaintiffs from IPA as a predicate to IPA being engaged for consulting services. Zayas does not offer opinions about the quality of the work done by IPA consultants once they were retained; his opinions relate solely to the initial assessment used to market IPA's services to clients. He opines that the Survey is not "objective" or accurately calculated and that it is skewed toward identifying "problem costs" of the client business based on which IPA could represent that the business would fail without IPA's help. Zayas opines that that instead of promoting objective analyses, the surveys are designed to support foregone conclusions; and furthermore, where the analyses purport to be based upon an accepted methodology (such as the Z-score formula that combines various performance ratios into a single score that roughly gauges corporate health), the calculations were incorrect.

Defendants again decline to explicitly challenge Zayas's qualifications or his methodology as a whole. Instead, they argue that Zayas's testimony is unhelpful and therefore inadmissible because (i) he opines that Defendants engaged in wrongful acts; (ii) his calculations are "faulty and confusing"; (iii) he is not a business analyst or consultant; and (iv) he fails to offer an opinion about fraud despite being a fraud examiner. The Court rejects the first two objections for the same reasons given with respect to Newman. First, Zayas does not just offer opinions about Defendants' liability for fraud; they are opinions about the methods and principles underlying the Survey produced for the Plaintiff businesses by IPA analysts and

14

consultants. His testimony about the accuracy of the work as compared to how it was described and marketed goes to an ultimate issue, but it is not objectionable on that ground. In any case, the Court will not permit Zayas to testify that Plaintiffs were defrauded or to offer any other legal conclusion. Second, Defendants' criticism of Zayas's calculations as "faulty and confusing" clearly goes to the soundness of the underlying opinions and quality of his work; this is not a question of admissibility but of the weight of his testimony, which Defendants will undoubtedly endeavor to minimize at trial through cross-examination and other means. But the Court does not understand Defendants to be arguing that the CPA's "faulty" conclusions are the product of an unreliable methodology.

The next argument Defendants advance is that Zayas's testimony will not assist the trier of fact because he has no expertise in consulting, the particular industry under scrutiny here. This argument misses the mark. First, to assist the trier of fact, testimony need only be relevant to "an issue" in the case. The quality of IPA's business consulting is certainly one issue, but so is the validity of the initial financial analysis presented to prospective clients in the Survey. Defendants also suggest that Zayas's testimony about the Survey is irrelevant (and therefore unhelpful) because customers were not required to retain IPA after receiving Survey results. Again, they are off base. The Survey is used to convince Plaintiffs to engage IPA; clearly, all of the Plaintiffs did so. Perhaps because the Survey had exactly its intended effect, they did not opt out of the engagement. But just because Plaintiffs could have walked away does not make the Survey meaningless to their claim that they were scammed into signing up for and retaining unnecessary and costly services. Furthermore, Zayas offers no opinions on the quality of consulting received after the Survey stage, so Defendants' argument that his lack of expertise in the precise field of management consulting bars his testimony is confusing. The Survey is not done by consultants

15

but "analysts," and as a CPA, Zayas can opine whether the analysts employed misleading accounting formulas instead of performing objective financial analyses, as Plaintiffs allege.

Defendant's fourth argument against Zayas is also perplexing; they say his testimony is inadmissible because he "has no opinion about fraud" (despite being a fraud examiner), "has no knowledge of the defendants' activities," and "has no opinion about the defendants." Defendants cite no authority for this argument and fail to develop it other than quoting at length from Zayas' deposition. Moreover, defendants objected—appropriately—that <u>Newman</u> improperly opined that Defendants acted fraudulently, yet they advance <u>Zayas</u>'s failure to offer such an opinion as a basis for finding his testimony unhelpful to a jury. Offering legal conclusions is not the province of experts, as Defendants themselves have repeatedly argued. And there is no reason, in assessing the legitimacy of the Survey, that Zayas would have occasion to opine about the skills or honesty of the individual defendants, either.

The Court notes, for the sake of completeness, that it rejects Plaintiff's argument that Defendants waived their challenge to the admissibility of Zayas's testimony by failing to object to it during summary judgment proceedings (when they were challenging Zayas based on improper disclosure). Defendants did not make any judicial admissions with respect to the admissibility of the testimony. And Defendant's counter-designation of a rebuttal expert, Louis Epstein, is also not a concession that the Plaintiff's expert testimony is admissible. This argument has no support in the law and is contrary to common sense, given that the Defendants had to make their disclosures long before being in position to substantively challenge the other side's experts.

### b. Defendants' Consulting Experts

The Court turns next to Plaintiff's motions [Dkt. ## 1019, 1032] to bar the admissibility of all of the current and former IPA employees whom Defendants disclosed as experts in a non-rebuttal capacity. The motions address the following IPA employees, with Defendants' description of their areas of expertise listed parenthetically: Lisa Vitello (Business Coordination); Thomas Ryan (Sales); Donna Brewer (Survey); Daniel Schneider (Consulting); Wayne Tyrrell (Software); Brian Cunningham (Assurance Program); Richard Belcher (Client Services); David Danzig (Enterprise Operations); and Michael Rudd (Consulting).

Plaintiffs move to exclude these experts based on lack of qualifications, arguing that they lack any specialized knowledge and did not use any reliable or reliably applied methodology.[5] Defendants counter that their seasoned employees possess specialized knowledge acquired through experience. It is true that an expert may qualify as such as a result of "experience." Fed. R. Evid. 702; *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). However, the proposed expert must still explain the "methodologies and principles" that support his opinion; he cannot simply assert a "bottom line." *Id.* (citing *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). And, of course, those methodologies and principles must be reliable.

Here, despite identifying each witness's expertise in a (somewhat) discrete area, such as "Sales" or "Software," these witnesses offer variations on the same opinion, raising the question of whether the opinions are indeed based upon specialized knowledge, as expert opinions must

---

[5] Defendants argue that Plaintiffs' motion should be stricken because the core arguments are presented in table form as an addendum to the motion. The Court takes less issue with the manner of the presentation (especially given the sheer volume of "expert" material Defendants provided) than with the minimal authority cited for the arguments. However, the Plaintiffs at least identify the basis for their objection to each expert and cite the applicable rule governing each. The Court finds the presentation sufficient to avoid waiver, and it declines to strike the motion based on its format.

be. All of the employees' stated conclusions boil down to what they think about Plaintiffs'
claims, Plaintiffs' experts, the integrity of IPA consultants, or the character of the individual
defendants. Expertise in "software," "sales," or any special field is not required to render such
opinions, which simply comment on the perceived merits of the case. The Court finds the
objectionable nature of the employee-experts' opinions so self-evident that it is compelled to
reproduce almost in full the section of each report labeled "Expert Opinion" (or other
comparable heading, as noted):

- Vitello (Assistant Director of Business Coordination): "[T]he [business
  consultants] are truthful and honest about IPA's services and what they
  will provide to clients. The Plaintiffs fail to show that the Defendants put
  into place any procedures that would cause the BCs to be fraudulent in
  their contact of potential clients."

- Ryan (Marketing Director): Opinion #1: "[T]he allegations of fraud and
  conspiracy to defraud are false. The structure of IPA creates a sales system
  where individual employees, from Business Coordination, Sales, Survey,
  and Consulting, are responsible for carrying out their duties independently
  of the other departments. We have employed a baton passing business
  methodology. Each department is run independently. Each employee
  within each department acts independently of other departments. Each
  employee makes his own judgment to help the client by moving the client
  forward in the process of engaging our services." Opinion #2: "I can
  categorically say, in my opinion, that there was no intent to defraud by any
  of the defendants. I have worked with all of them, and each person has
  acted to help business owners improve their business operations and to
  make like better for their clients and the client's business through our
  business analytical, consulting, and strategic tax planning services. All of
  the defendants were acting in good faith to help all of our clients by
  providing benefit and value."

- Brewer (Survey Services Director): "[T]here is no evidence whatsoever
  which is presented by the Plaintiffs which purport to show any scheme to
  defraud on the part of each individual Defendant. My review of the record,
  along with review of the statements made by Plaintiffs' experts, indicates
  that this matter is a dispute regarding allegations of fraud and breach of
  contract. There is no evidence which illustrates that John Burgess, Tyler
  Burgess, or Gregg Steingberg institutionalized any fraudulent scheme, nor
  continued to operate scheme to defraud."

- Schneider (Consulting Services Director): "[I]t is my experience that the allegations complained of by Plaintiffs are baseless and that IPA is a business that works tirelessly to improve businesses and does not use fraudulent means to do so. Everything that is in place is for the benefit and value of the client and their business."

- Tyrell (Consulting Services Support Manager): "It is my opinion, based upon the foregoing analysis, that the report produced [by] Plaintiff's expert, Mr. Zayas, is based upon the use of innacurate information and information not produced by Defendants through their enterprise, IPA. The processes and procedures used by the analysts and consultants were free from misrepresentations and underlying bias. There is nothing which proves that John Burgess, Tyler Burgess, or Gregg Steinberg institutionalized any fraudulent scheme, nor continued to operate a scheme to defraud."
  - Supplemental Report (excerpted): "[T]he entire Z-score section of Mr. Zayas's report is unsupported, unreliable with erroneous conclusions." "In my opinion, Mr. Zayas' reports referencing RMA data and his opinions based on that data appear to be contrived in order support his uninformed analysis."

- Cunningham (Senior Business Consultant): "[N]one of the current plaintiffs qualified for the three-to-one assurance program based upon the necessary qualifications for the program. Furthermore, none of the defendants exercised any control over the consulting operations. The driving force that is reiterated daily to field consultants is to focus on what benefit was being delivered to the client on any given day."

- Belcher (Director of Client and Legal Services) (Excerpts of "Summary"): "Plaintiffs' allegations fails to describe any conduct on the part of the Defendants which would lead me to believe that they desgined a business model to intentionally defraud any clients. There is no activity related to their responsibilities which would indicate that they influenced the delivery of services to clients that could possibly be described as deception or fraud." "Defendants were committed to performing their respective duties as Directors of IPA in order to provide beneficial services to clients, which in turn generated revenues, which paid the salaries, commissions, and expenses of over 1,100 employees….Plaintiffs' allegations and the opinions of their expert do not support the conclusion that the Defendants violated the Federal RICO statute." "In effect the Plaintiffs purchased analytical and consulting services and admitted receiving those services. The fact that the Plaintiffs now claim to be dissatisfied with those services is unavailing."

- Danzig (President): "[I]t is my opinion that Plaintiffs' allegations have no basis in fact. There is no connection between what Plaintiffs have alleged

and the conduct of the Defendants. My experience with each of the Defendants and their specific responsibilities and duties indicates that they had no contact with any of the Plaintiffs, and, furthermore, were only tangentially involved with the services provided to each of them. Defendant's efforts were focused on providing benefits and value to their clients through analytical and consulting services…. I found no support for any of the Plaintiffs' allegations that the Defendant violated the Federal RICO Statute."

- Rudd (Former Survey Service Executive, Assistant to Managing Director, Senior Project Manager, Director of Special Projects, and Director of Client Services) ("Conclusion"): "Mr. Zayas has failed in his attempt to show that the business analysis provided to the Plaitniffs was not objective and did not provide the business owner with an unbiased view of its strengths and weaknesses….From my review of the Plaintiffs [sic] IPA files, each Plaintiff received a thorough analysis, and were [sic] satisfied with the work performed by each IPA analyst at the conclusion of the survey. This satisfaction is evidence by the payment of the survey via the client satisfaction guarantee, which almost every Plaintiff paid. Ultimately, Mr. Zayas has no knowledge of the completeness of each Plaintiffs [sic] financial records or how personal communication may have focused on one aspect of the business as supposed [sic] to another. The incompleteness of Mr. Zayas' report is matched by his failure to link any of the Defendants to any of the findings in his report. Such inability to tie in the allegations of his affidavit to the allegations of Plaintiff's complaint is understandably problematic."

Little explanation should be required about why these opinions are not properly the subject of expert testimony at all—but particularly from experts who are supposedly qualified in substantive areas that do not relate to the opinions they provide. These IPA (now ISI) employees or former employees are offering legal conclusions about the merits of Plaintiffs' RICO claims, completely violating the province of the jury. Whatever the expertise claimed by these employees, it is not legal expertise, and they cannot opine on the viability of the RICO claims, the quality of the evidence, and the methodology of Plaintiffs' independent experts outside the consulting, computing, and business expertise the witnesses claim. *See Good Shepherd Manor Found., Inc., v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("The proffered testimony was largely on purely legal matters and made up solely of legal conclusions, such as conclusions

that the city's actions violated the FHAA. The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). Moreover, there is certainly no need for so many different witnesses to offer substantially the same testimony about Plaintiffs' claims.

The balance of the proposed expert opinions consists of descriptions of and opinions about IPA's business practices, based on the witnesses' experiences. Defendants' case will inevitably and appropriately include evidence describing its business practices, and some of that testimony may be based upon "first-hand sensory observations," which is the very definition of *lay* opinion testimony. To that extent (and to the extent they were timely and properly disclosed) these witnesses may be able to offer opinion testimony, *see, e.g.*, *United States v. Conn*, 297 F.3d 548, 553-54 (7th Cir. 2002), but Defendants cannot burnish their evidence by anointing their employees as "experts" simply because they performed the tasks at issue or have related experience. Finally, the favorable views of the character of the individual defendants held by these witnesses is inappropriate expert testimony because it is not based on "scientific, technical, or other specialized knowledge," *see* Fed. R. Evid. 701(c); moreover, the defendants make no showing that evidence of their character is admissible in any form. *See* Fed. R. Evid. 608(a). And expert witnesses are not permitted to simply bolster the credibility of parties or their witnesses.

As for the witnesses who purport to rebut the Plaintiffs' expert Ricardo Zayas—Rudd and Tyrell—the Defendants fail to establish either the qualifications of the experts in the field of accounting or a like field, so as to permit them competently opine on his work. According to the defendants, Rudd and Tyrell are experts in "software" and "consulting," respectively. Nor do Defendants show that they employed a reliable methodology in analyzing Zayas's opinions and

calculations. They, too, offer what is more appropriately viewed as lay opinion: it is based on first-hand knowledge and is not the type of testimony that anyone with specialized accounting knowledge could offer. *See Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 864 (7th Cir. 2009). Finally, their testimony goes to the soundness of Zayas's conclusions more than their admissibility.

Therefore, the Court grants the motion to bar Vitello, Ryan, Brewer, Schneider, Tyrrell, Cunningham, Belcher, Danzig, and Rudd from testifying as "expert" witnesses under Rule 702. To the extent that any of these witnesses were timely disclosed pursuant to Rule 26(a)(1), they might be able to provide relevant testimony about fact issues, as they are all knowledgeable in some way about how IPA operates. Or, as discussed above, with proper foundation some of these witnesses might be able to provide *lay* opinion testimony at trial.[6] But none offers opinions that are properly admissible as expert testimony.

### c. Defendants' Rebuttal Tax and Damages experts

Finally, the Court turns to Plaintiffs' motions (Dkt. ## 1020, 1030, 1033) to bar the expert testimony of Defendants' rebuttal witnesses Breeman, Clauser, and Wallis—again, all IPA employees. The Court sympathizes with Defendants' arguments that Plaintiffs' motions or "objections" are not well developed and possibly untimely. However, the first criticism frankly applies to the flurry of motions on *both* sides, and rather than striking the poorly developed motions, the Court has chosen to consider the arguments that are sufficiently developed and ignore the rest—for both parties. As for the issue of timeliness, the Court will not second-guess the prior district judge's decision to extend the filing dates or excuse the Plaintiffs from properly noticing their motions.

---

[6] The Court takes no view on these issues at this time.

Clauser, the first of Defendant's proposed tax experts, opines:

- My opinion, based on my eight years of experience working as the Business Development Manager and the foregoing information, is the [sic] we provide customized work product to our clients. Further, my work dictates I work diligently and thoroughly to examine each clients' tax information as it is presented to me in order to produce a customized estimate of tax related benefit. Our consideration to each client's unique and individual circumstance surrounding their tax situation, legal structure, ownership, compensation methodology, accounting reporting methods, and location of operations leads to a personalized Illustration.

The second tax expert, Wallis, opines:

- ITA provides support throughout its material with references and citations to the Internal Revenue Code, Treasury Regulations, Administrative Rulings and the like, for the purpose of supporting those recommendations, are what should be noted. There is no logical pathway in reaching the allegations and no technical support for his arguments. Rather, the Plaintiffs simply hurl a slew of unsupported accusations that are easily dismantled by a clear reading of the recommendations and their supporting materials. Pursuant to the contract, ITA provides information and recommendations that are within the Internal Revenue Coe and other regulations. The Plaintiffs' allegations and their experts' opinions are misguided and completely false.

Plaintiffs argue that Clauser's and Wallis's testimony is based on their personal experiences, not upon any specialized knowledge that they obtained through work experience, education, or otherwise. The Plaintiffs also protest that the two tax experts base their opinions on materials that Defendants failed to disclose.[7] Finally, Plaintiffs argue that the experts are simply bolstering the testimony of the Defendants' fact witnesses that there was no improper conduct. Defendants retort that the tax experts offer opinions based on their education, experience, and the applicable state and federal laws, and that they reliably applied their tax expertise in the review of Newman's report and the tax consulting records for the Plaintiffs.

---

[7] The plaintiffs have not provided sufficient information to permit the Court to assess this argument.

Similar arguments are made about Ken Breeman, the proposed damages expert. Breeman was disclosed as an expert on "Plaintiff's Damages," and as part of the disclosure, Defendants stated that Breeman would (1) address "the financial performance obtained by each Plaintiff subsequent to the termination of the consulting engagements and the consequential damages claimed by the Plaintiffs, as a result of the consulting arrangements, based upon his analysis of the documents received from the Plaintiffs in this matter"; (2) opine that "the individual Defendants did not participate in any improper acts related to their management or control of Non-Party [IPA]. And that the integrity of the operational and administration process employed by Defendants and Non-Party Plaintiff [sic] [IPA] prevented the perpetration any scheme to defraud Plaintiffs"; and (3) address "the opinion of Plaintiffs [sic] expert witness, as contained in the report submitted by Ricardo C. Zayas." Defendants further disclosed that Breeman *might* (emphasis added) opine about "allegations contained in the Complaint related to the Survey Process, in particular those claims made by Plaintiff Cardullo, and Plaintiffs [sic] alleged consequential damages." Despite this broad disclosure, Breeman's expert report states (only) the following opinion: "IPA maintains a sincere desire to provide value and benefit for our clients. My experience is that IPA management has worked diligently to provide this much needed assistance for our clients and that they did not participate in any improper of fraudulent acts with regard to their management or control of IPA."

Plaintiffs protest that Breeman is a high-school graduate and "failed entrepreneur" who has no qualifications within the meaning of Rule 702. They further argue that his testimony is unreliable, irrelevant, and duplicative. Defendants counter that Breeman is an experienced business analyst who has conducted more than 1700 surveys for IPA, whose opinions are based solely on that experience and not his "subjective belief." Indeed, Breeman was the business

24

analyst assigned to one of the Plaintiffs (Cardullo). Defendants state that barring Breeman would be akin to barring Bill Gates or Thomas Edison, who also lacked college degrees.

The Court first grants Plaintiffs' motions to bar Clauser, and Willis. One needs only to glance at their opinions to see that they are not proper expert testimony for purposes of rebutting Newman's testimony or otherwise. First, testimony from current ITA employees about how ITA prepares tax analyses and illustrations for its clients, including whether the advice is customized, is fact testimony based on firsthand knowledge. For example, Clauser's "expert report" contains a long description of how ITA prepares its Illustrations; it is just a summary of how she does her job. This fact testimony is admissible as such to the extent it is relevant and to the extent that the witness was properly disclosed. Second, the purported rebuttal testimony is really just cross-examination material. Rather than independently analyzing the data to provide an alternative conclusion, the experts simply criticize Newman. Wallis, for example, devotes the bulk of his declaration to arguing that Newman misread or missed information provided by ITA; he is doing nothing that Defendants' counsel could not do on cross-examination. Third, commentary about the veracity of Plaintiffs' allegations, as already noted, is not the proper subject of expert testimony, like the other legal conclusions drawn by Clauser and Wallis. For example, Wallis's thoughts on the proper application of the alter ego doctrine are well beyond the realm of valid expert opinion. It is the province of the fact-finder, not these so-called experts, to determine whether Plaintiffs have viable claims. The rules of evidence (both Rule 702 and Rule 704) "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Roundy's Inc.*, 674 F.3d at 648; *see RLJCS Enterprises, Inc. v. Professional Ben. Trust Multiple Employer Welfare Ben. Plan and Trust*, 487 F.3d 494, 498 (7th Cir. 2007). Finally,

although it is moot because both experts are stricken, the Court sees no "good cause" why Defendants would require two tax experts.

The Court also grants the motion to exclude Breeman as an expert. At the risk of sounding like a broken record, Breeman's disclosed opinion—that the defendants did not participate in fraud—is a legal conclusion he is unqualified to make and which is not properly the subject of expert testimony. To the extent that the report also states conclusions (not labeled as "opinions") about the Plaintiffs' financial performance, despite the *Daubert* challenge the Defendants have not established his qualifications to perform such financial analyses, or that he used a reliable methodology. His conclusions are purportedly based upon documents provided by the Plaintiffs themselves, but he never says what he *did* with these documents, rendering the professed methodology wholly opaque. Moreover, Breeman's purported analysis of Plaintiffs' financial performance (he attempts to show a net income increase for certain IPA clients) is the most obviously unreliable portion of the report. His "analysis" simply determines whether the net income of the plaintiffs increased during, or after, their engagement of IPA and attributes all net income increases to benefits provided by IPA without any basis for doing so. He makes no attempt to apply any methodology that would help to establish causation or account for the many variables that could affect the plaintiffs' net income. Defendants also do not show that Breeman is qualified to rebut Zayas's report and, in particularly in light of his proffered analysis, it is far from obvious that his practical business experience in itself allows him to reliably challenge the CPA's work. *See e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 646 (7th Cir. 2011) (expert properly excluded where testimony went beyond scope of witness's business knowledge). And like the other employee experts, Breeman (along with Clauser and Willis) also

steps out of expert territory in opining about the sincerity, good faith, or character of the individual defendants. This is simply not proper expert testimony.

It bears emphasis that the witnesses' positions as current or former employees is not the problem. Purported "experts" who are employees of the party on behalf of whom they offer testimony may have an inherent credibility problem, and this effect is amplified when the "expert," like Breeman, was actively engaged in the consulting engagement challenged by one plaintiff (Cardullo). But credibility is left for a jury to assess, so this kind of self-serving expert testimony is not inherently inadmissible. *See, e.g., Rizzo v. Corning, Inc*., 105 F.3d 338 (7th Cir. 1997). But neither does the Court take at face value that working at IPA or ITA gives these individuals sufficient experience to qualify as experts applying reliable methods to the issues in this case. Defendants have not met their burden under Rule 702 and *Daubert*. "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard….Under Rule 104(a), the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (internal quotation marks and citations omitted). Here, there has been no showing that these witnesses indeed possess scientific, technical, or specialized knowledge sufficiently distinct from the first-hand knowledge they clearly have, or that their testimony even requires any specialized knowledge. Also lacking is a reliable methodology, reliably applied—extrapolating from personal experience is not an objective or replicable methodology. "Personal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert*'s most significant guidepost." *Chapman v. Maytag Corp*, 297 F.3d 682, 688 (7th Cir. 2002). And there is no escaping that the core opinions offered by the employee-experts relate to the perceived merits of Plaintiffs' allegations.

Defendants simply have not met—indeed, have not come close to meeting—their burden of establishing the admissibility of its employees' testimony in an "expert" capacity.

* * *

For the reasons stated herein, the Court GRANTS Defendants' motion to exclude witnesses Carpenter and Baldino for inadequate disclosure. The Court DENIES Defendants' motion to exclude the testimony of Plaintiffs' experts Newman and Zayas as inadmissible, but such testimony shall be limited as described herein. Finally, the Court GRANTS Plaintiff's objections or motions to bar Defendants' proffered expert witnesses Vitello, Ryan, Brewer, Schneider, Tyrrell, Cunningham, Belcher, Danzig, Rudd, Clauser, Willis, and Breeman.

Entered: November 2, 2012

John J. Tharp, Jr.
United States District Judge